**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alice Durlene NALL, Mahlon E. Faust,**
**and Robert Hise Sportsman,**
**Defendants-Appellants.**

No. 29432.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1971.

---

Travis C. Johnson, El Paso, Tex., for Alice Durlene Nall; Calamia & Fashing, El Paso, Tex., on appeal only.

Wayne Windle, Peticolas, Luscombe, Stephens & Windle, El Paso, Tex., for Mahlon E. Faust and Robert Sportsman.

Seagal V. Wheatley, U. S. Atty., El Paso, Tex., Jeremiah Hardy, Asst. U. S. Atty., James W. Kerr, Jr., Asst. U. S. Atty., W. D. Tex., San Antonio, for plaintiff-appellee.

Before RIVES and SIMPSON, Circuit Judges, and NICHOLS,* Judge of Court of Claims.

RIVES, Circuit Judge:

Alice Durlene Nall,[1] Robert Hise Sportsman, Mahlon E. Faust, and Joseph Cecil Frazier [2] were indicted in two counts. The second count charged them with the unlawful transportation in interstate commerce of stolen securities, that is, approximately 900,000

---

* Honorable Philip Nichols, Jr., sitting by designation.

1. She was remarried to a Mr. Curtis at the time of trial, but for convenience she is referred to throughout the briefs and arguments as Nall.

2. Frazier had not been arrested at the time of trial.

shares of stock in North American Cigarette Manufacturer's, Inc., of the value of more than $5,000 in violation of 18 U.S.C. § 2314.[3] The first count charged them with conspiracy in violation of 18 U.S.C. § 371[4] to commit the substantive offense charged in the second count. The jury found them guilty under the first (conspiracy) count but not guilty under the second (substantive) count.

The indictment alleged that the conspiracy commenced on or about September 13, 1965 and continued until on or about September 16, 1965. The overt acts in furtherance of the conspiracy were alleged to have been committed on September 13, 14 and 16, 1965.

The evidence established that on September 14, 1965, the Mesa Hotel in El Paso, Texas, was burglarized and some papers, including the securities named in the indictment, were stolen. On about April 14, 1966, some seven months after the burglary, the securities were mailed back to their owner, Newell Raymond Hays, after he had paid a thousand dollars for their return. The payment and return of the papers were accomplished as the result of telephone conversations to Hays from a man who gave his name as Jim Smith. "Jim Smith" continued his efforts to get more money. Mr. Hays testified:

> Mr. Smith called me, wanted some more money. I said 'Well I'll give you five hundred dollars if you will

write to the best of your knowledge how all this happened', and he finally agreed to do so, and he did send me a letter, and then after he sent me the letter, then I send him the five hundred dollars." [App. p. 184.]

The letter was postmarked September 19, 1966 [App. 157] and was introduced over the defendants' objections as Government Exhibit 3. It reads as follows:

"Newell,

> "This will be the information to the best of my knowledge, however, all of my information is here say [sic]. Approximately one month prior to the robbery Joe Frazier contacted a pilot and owner of a twin engine aircraft by the name of Sportsman. A female from California by the name of Durlene Nall and another guy by the name of Mahlon Faust convinced them there was approximately 80 to $100,000.00 kept in your safe at your motel to which you could not report as stolen because it was not claimed on your income tax reports. Telling them that the money was derived from the sale of gold and silver, Joe Frazier producing documents proving that you and he were operating and dealing in gold and silver.

> "After convincing them to join him and stealing the money they flew to El Paso to plan the robbery. They planned it pretty much as it occurred, to send Durlene into the motel, telling the night manager that she

---

**3.** The pertinent part of 18 U.S.C. § 2314 reads:

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud

\*　　\*　　\*　　\*　　\*

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The word "value" as used in the chapter is defined in the preceding section 2311 as follows:

"'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods,

wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof."

**4.** The pertinent part of 18 U.S.C. § 371 reads:

"§ 371. *Conspiracy to commit offense or to defraud United States*

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

had just had a fight with her husband and to entice the night manager to go to the room with her for the purpose of a little free sex. The girl went to the room first with the night manager agreeing that he would meet her there in approximately thirty minutes, during which time she let Frazier and Faust into the room. They were waiting in the closet when the night manager came in. They acosted [sic] him, taped and gagged him and left him there with Faust while Durlene and Frazier went to get the safe. They took the safe from the office along with some travelers checks & money. With the use of same a cutting torch they cut the safe open in a motel approximately a block & a half from your motel on the way out of town. Finding the safe not *overflowing with money* they were all disheartened with the exception of broth [sic] Frazier. They remained in the motel for four days during which time Faust called you and attempted to sell you the papers. When they saw you were going to call the police, they tried to sell the papers to a gambler in Louisiana for $30,000.00. His name was Ted, who is now dead. I do not know his last name. He is the one who called you and threatened your life however he didn't come up with the money and the papers lay dorment [sic] for approximately ten months. When they were sold to a Las Vegas business people [sic] for $8,000.00 and I was subsequently commissioned by them to make contact with you—The rest of which you know.

"As to the whereabouts of these people I have no definite information but with the information supplied here within I'm sure you won't have any trouble locating them.

"As to the whereabouts of these people I have no direct part in the robbery—I'm sending you a self addressed envelope and will call you upon your receipt of this letter and am

hoping that you will keep your part of the bargain as well—"

The first and principal witness for the Government was a former Las Vegas, Nevada, policeman named Robert Lee Cleveland, who identified himself as the "Jim Smith" who had the telephone conversations with Hays and who received the $1000 and the $500 which Hays had paid. Cleveland testified that the $1000 first paid was divided between Sportsman and himself, Sportsman receiving $450 and Cleveland keeping $550, and that the last payment of $500 was kept by Cleveland alone. Cleveland testified that he first heard of the burglary in February 1966 when Sportsman approached him about negotiating with Hays for the sale of the stolen securities. Cleveland had never met any of the other defendants. He testified that all of the information he had about the burglary was related to him by Sportsman. The letter [Government Exhibit 3] which has been quoted was introduced in evidence, over the defendants' objections, on the Government's redirect examination of Cleveland and substantially summarizes his testimony on direct examination.

Sportsman, testifying in his own behalf, denied any connection with or knowledge of the burglary and denied having made the statements to which Cleveland had been permitted to testify.

On appeal the defendants urge more than twenty issues for reversal. We discuss only a few of those issues which do necessitate reversal, in the belief and hope that the issues not discussed will most likely not recur on any retrial of the defendants.

## I.

### Hearsay Testimony Inadmissible Against Nall and Faust.

The district court erred in overruling Nall's and Faust's objections to Cleveland's testimony as to what he claimed Sportsman had told him in February of 1966 about their involvement in a bur-

glary which had taken place in September of 1965. As against Nall and Faust, Cleveland's testimony was inadmissible hearsay. The Government urges that Nall and Faust were parties with Sportsman to a conspiracy which extended beyond the burglary and to the efforts to sell the stolen securities back to Hays.

■ A conviction for conspiracy cannot be sustained unless there is proof of an agreement, express or implied, to commit an offense against the United States. Pereira v. United States, 1954, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435; Ingram v. United States, 1959, 360 U.S. 672, 677, 678, 79 S.Ct. 1314, 3 L. Ed.2d 1503. The effect of such an agreement is aptly described as constituting a "partnership in crime." United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 253, 60 S.Ct. 811, 84 L. Ed. 1129; Pinkerton v. United States, 1946, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489; Fiswick v. United States, 1946, 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196. Thereby a conspirator becomes responsible for the acts, statements and declarations of each of his coconspirators made while the conspiracy is pending and in furtherance of its ob-

ject. For that reason, it is firmly established that out-of-court statements of one conspirator where made in furtherance of a going conspiracy are admissible in evidence against a coconspirator. Krulewitch v. United States, 1949, 336 U.S. 440, 443, 69 S.Ct. 716, 93 L. Ed. 790. That case, however, teaches that the courts should be reluctant to expand this "narrow exception" to the hearsay rule and hold admissible a declaration not made in furtherance of the conspiracy charged but made in furtherance "of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment."

"The rule contended for by the Government could have far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence." 336 U.S. at 444, 69 S.Ct. at 718.[5]

---

5. Similarly, in Lutwak v. United States, 1953, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593, the Court said:

"Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party. Clune v. United States, 159 U.S. 590, 593 [16 S.Ct. 125, 126, 40 L.Ed. 269]. See United States v. Gooding, [25 U.S.] 12 Wheat. 460, 468–470 [6 L.Ed. 693]. But such declaration can be used against the co-conspirator only when made in furtherance of the conspiracy. Fiswick v. United States, 329 U.S. 211, 217 [67 S.Ct. 224, 227, 91 L.Ed. 196]; Logan v. United States, 144 U.S. 263, 308–309 [12 S.Ct. 617, 631–632, 36 L.Ed. 429]. There can be no furtherance of a conspiracy that has ended. Therefore, the declarations of a conspirator do not bind the co-conspirator if made

after the conspiracy has ended. That is the teaching of Krulewitch v. United States, supra [336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790], and Fiswick v. United States, supra."

Most recently in Dutton v. Evans, 1970, 400 U.S. 74, 91 S.Ct. 210, 23 L.Ed.2d 213, the Court again stated the principle:

"It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise. Lutwak v. United States, 344 U.S. 604, [73 S.Ct. 481, 97 L.Ed. 593]; Krulewitch v. United States, 336 U.S. 440 [69 S.Ct. 716, 93 L.Ed. 790]."

See also United States v. Harrell, 5 Cir. 1970, 436 F.2d 606 [decided December 14, 1970].

True, a conspiracy may have multiple objectives and the conspiracy continues through the primary objective and through subsequent minor subsidiary objectives. Ingram v. United States, 1959, 360 U.S. 672, 679, 680, 79 S.Ct. 1314, 3 L.Ed.2d 1503.

The statements which Cleveland claimed were made to him by Sportsman did not in any way purport to connect Nall and Faust with any conspiracy which would extend months beyond the burglary to Cleveland's efforts to sell the stolen securities back to Hays. Cleveland's testimony as to the sale and the division of the $1000 is more consonant with the theory that Sportsman and Cleveland were the only persons then concerned with the stolen securities or their sale.

■ Indeed, there is no evidence admissible against Nall and Faust to prove that they were coconspirators with Sportsman to commit the crime. That is true under the principle well stated by Judge Strum in Montford v. United States, 5 Cir. 1952, 200 F.2d 759, 760:

> "The declarations of one conspirator made in furtherance of the objects of the conspiracy, and during its existence, are admissible against all members of the conspiracy. Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. But a defendant's connection with a conspiracy can not be established by the extrajudicial declarations of a co-conspirator, made out of the presence of the defendant. There must be proof *aliunde* of the existence of the conspiracy, and of the defendant's connection with it, before such statements become admissible as against a defendant not present when they were made. Glasser v. United States, 315 U.S. 60, 74, 62 S. Ct. 457, 86 L.Ed. 680, 701; Minner v. United States, 10 Cir., 57 F.2d 506; May v. United States, 84 U.S.App.D.C. 233, 175 F.2d 994; United States v. Nardone, 2 Cir., 106 F.2d 41, reversed on other grounds, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307."

Apart from the hearsay evidence of claimed declarations by Sportsman, there is no proof that Nall and Faust participated in the commission of any crime.

II.

*Cleveland's Letter, Government Exhibit 3, Not Admissible Against Any of the Defendants on Their Joint Trial.*

On cross-examination of the witness Cleveland, counsel for the defendants had asked impeaching questions, bringing out that he had been indicted on a felony conspiracy charge in August 1967, had been permitted in 1968 to plead guilty to a misdemeanor and had not yet been sentenced. Cleveland testified in part:

"A. I at one time did ask for an immunity type thing for my wife, yes.

"Q. That would have been probably about March of '67 that you started inquiring about the possibility of this immunity for your wife and that sort of thing, right?

"A. Yes, sir.

"Q. Isn't it a fact that you stated flatly to the agents that if your wife was granted immunity that you and she would furnish information involved in the matter; isn't that right?

"A. Yes, sir, I guess that is right.

"Q. Didn't you also state to the agents that if you were subsequently charged with interstate transportation of stolen property you would stand mute, but if not charged, you would testify, isn't that what you told them?

"A. I don't recall saying that.

"Q. You don't deny that?

"A. No, I don't deny it." [App. p. 58.]

On redirect the court volunteered the following advice to the United States Attorney: "Mr. Wheatley, in view of the cross-examination, you may ask him why he got into this if you wish to go into that now, you may do so." [App. p. 75.]

Thereafter, over the defendant's objections, the Government identified the

Government's Exhibit 3, which has heretofore been quoted, and introduced that letter which Cleveland under an assumed name had mailed to Mr. Hays, postmarked September 19, 1966. The Government emphasized the relevancy of the letter as follows:

"Q. All right. So actually, long before your arrest or any of these matters that Mr. Windle was going into a while ago where he inferred it was some years after your arrest that you first came up with this story, as he called it, about Sportsman, actually you had written that in September of 1966, details of how this robbery occurred and mailed it to Mr. Hays?

"A. Yes, sir, I did." [App. pp. 80–81.]

As to Nall and Faust, the letter was inadmissible hearsay for reasons which have been sufficiently stated in Part I of this opinion. As to Sportsman, the question of admitting this letter to support the credibility of the witness Cleveland would normally be addressed to the discretion of the trial court. If so admitted, the letter should be considered by the jury only as affecting the credibility of the witness and not as substantive evidence of the truth of the facts. Dowdy v. United States, 4 Cir. 1931, 46 F.2d 417, 424; United States v. Lewis, 7 Cir. 1969, 406 F.2d 486, 492; United States v. Alexander, D.C.Cir. 1970, 430 F.2d 904, 905; Wigmore on Evidence 3rd ed., Vol. IV, §§ 1100–1144, particularly § 1132. In the present case the court refused to permit counsel to state the grounds of objection to the letter and stated that the letter was being admitted "with limitations" (App. 82), but nonetheless failed to give any limiting instructions to the jury.

█ As the case stands, the admission of the letter in the joint trial of Sportsman with Nall and Faust was clearly erroneous, not only because there were no limiting instructions but also because it would be practically impossible for a jury not to consider the letter as substantive evidence on the facts against Nall and Faust. Further, the probative effect of the letter toward supporting Cleveland's credibility as a witness against Sportsman is far outweighed by its prejudicial effect upon Nall and Faust. In the event of any retrial of Sportsman jointly with Nall and Faust or with either of them, this letter should not be admitted in evidence. We cannot anticipate the circumstances under which the letter might be offered in evidence against Sportsman if he is retried as the sole defendant, and we undertake no decision as to its admissibility in such a possible trial.

III.

*Value of the Securities Not Sufficiently Proved.*

As will be observed from a reading of the statute, 18 U.S.C. § 2314, along with the definition of "value" in section 2311,[6] the face, par or market value of the stolen securities must be $5,000 or more for their transportation in interstate commerce to constitute the federal crime. No face or par value appears on the certificates for the shares of stock in North American Cigarette Manufacturers, Inc., and no evidence was introduced to prove any face or par value. The only evidence which might tend to prove market value of the stock certificates is the testimony of Hays, their owner. He testified that, in his opinion, the reasonable market value of the stock on the date it was stolen was ten cents a share, or ninety thousand dollars for the 900,000 shares [App. 161]. Mr. Hays further testified that he had been president of the corporation from about February to June or July of 1964 [App. 160]; that he understood that the corporation had about 400 stockholders [App. 171]; that he did not know whether the corporation was operating at the time of the burglary [App. 170]; that when he first reported the burglary he failed to men-

6. The pertinent parts of the two sections are quoted in footnote 3, supra.

tion that the stock certificates were in the safe, that he had forgotten them and did not report their loss until after they were returned; that this stock was not the type of stock which is listed on any stock exchange, but is "what we call over the counter stock" [App. 171].

The importance of Hays' testimony justifies some quotations:

"Q. What I'm getting at is when it was inoperative in September of '65, at that time it probably didn't have any market value in El Paso County, isn't that true?

"A. I just don't know.

"Q. Okay. Because it was inoperative, it very well may have had no market value in El Paso County; that is correct, isn't it, so far as you know?

"A. So far as I know.

"Q. This is not stock just freely negotiable where the certificate itself is like cash or like bonds or something like that, is it; it's not freely negotiable; there are restrictions on it, aren't there?

"A. This stock there was [sic] restrictions on it.[7]

\* \* \* [App. 171–172.]

"Q. The certificate itself, in 1965, so far as you may or may not have had any market value because at that time the company was not in operation, is that true? I'm talking about the certificate now.

"A. I believe it did have a market value.

"Q. You don't know what it was, and you're not sure that it did, is that correct, at that time?

"A. Well, I felt like that it did.

"Q. Hoping that it did, but really don't know whether it did or not, is that true?

"A. Well, I always felt like that it did. [App. 175.]

\* \* \* \* \* \*

"Q. Mr. Hays, I'm confused at this point in that I do not know what the

North American Cigarette Manufacturing, Inc. is, what kind of a company is that?

"A. You mean at that time or at the present time?

"Q. At that time, in 1965.

"A. It was—the president at that time and the officers of the company were trying to get someone to take over the corporation.

"Q. What was the corporation's purpose at that time; was it in operation for business purposes?

"A. Not to my knowledge at that time.

"Q. Was there any income being derived by you as an officer at that time?

"A. I was not an officer of the corporation at that time.

"Q. Were there any dividends being paid in 1965?

"A. No, there were no dividends.

"Q. Can you, of your own knowledge, say positively what the value of the stock was in September of 1965?

"A. I don't know of any sales of the stock, because that is in Miami, and I was here. I only kept up with them about once every six months or a year. Then it began to drag out longer than that.

"Q. So you can't tell us what the value was at that particular time?

\* \* \* \* \* \*

"THE WITNESS:

"I feel like it was worth ten cents a share at that time.

"Q. \* \* \* But it was not in operation?

"A. No, it was not in operation.

"Q. That is just your own personal opinion?

"A. Yes." [App. 181–182.]

---

7. There was no testimony as to the nature of the restrictions.

Instructing the jury on the question of the value of the shares of stock, the district judge charged as follows:

"The only testimony you have on that is the testimony of the owner of it, Mr. Hays, and he is the owner—he as the owner is entitled to give his opinion as to value of it, and you all will bear this in mind in connection with that. An essential element of crime being it must have a value of five thousand dollars or more. Value ordinarily means a market value or price a willing buyer would pay a willing seller at the time the property was stolen. If there is no market value for the securities for these 900,000 shares of stock, the jury may consider other reasonable methods to determine whether the stolen items have a monetary value of five thousand dollars or more. One other such reasonable method of determining the value as [sic] the evidence value of the securities to the owner thereof during the period the property is owned by the property owner prior to its being stolen, so there is sufficient evidence here, if you accept the testimony of Mr. Hays, from his testimony there's sufficient evidence for you to find this stock is worth more than five thousand dollars. You determine that. You weigh that, as I told you in the beginning. You're the ones that pass on the credibility of the witnesses and the weight to be given to their testimony, but the evidence of Mr. Hays is sufficient, if you so accept it to meet that requirement which is on the Government that the goods were worth—the stock was worth more than five thousand dollars or more." [App. 410–411.]

To this charge the defendants seasonably objected. [App. 420.]

▮▮▮ The question posed by this statute is not the "value of the securities to the owner," as charged by the district court, but rather "the face, par, or market value" of the securities. Since the stock had no face or par value, the question is narrowed simply to its "market value." As said in Abbott v. United States, 5 Cir. 1956, 239 F.2d 310, 313:

"Congress plainly restricted value to three well-understood standards. Mere cost of production, cost of replacement, value to the owner, value to one who might have use of it under certain special circumstances, whatever else it might be, is not market value. For that value—market— depends on a market, whether formal or informal, in which willing buyers bargain with willing sellers.

"Plain language of the Congressional Act makes unnecessary, if not proscribed, a rationalization of the legislative precision in fixing the *kind* of values. But it is not lacking. The very requirement of a $5,000.00 value points towards a Congressional purpose carefully to limit the Federal sanction in theft of nonambulatory things to those having a substantial worth. To have prescribed actual or intrinsic value as a test would have but multiplied uncertainties in which worth would, or might be, fixed by undulating elusive factors of which personal sentimental attachment, collateral cost of production, unique value to a particular person are but typical."

We agree also with the Seventh Circuit's statement in a case which did not involve the present statute:

"But the owner's qualification to testify does not change the 'market value' concept and permit him to substitute a 'value to me' standard for the accepted rule, or to establish a value based entirely upon speculation."

United States v. Sowards, 10 Cir. 1966, 370 F.2d 87, 92.

The Government urges in its brief:

"The $5,000.00 limitation in Title 18, United States Code, Section 2314, was not designed to protect those who transport property of a lesser value but to avoid overtaxing the Department of Justice. United States v.

Schaffer, 266 F.2d 435, 440 (2nd Cir. 1959), aff'd 362 U.S. 511 [80 S.Ct. 945, 4 L.Ed.2d 921] (1960)."

While we agree that the $5,000.00 limitation was not designed to protect those who transport stolen property of a lesser value, its effect is to leave the punishment of such persons to the several states and to make the limitation an essential part of the federal crime. Proof of the value of the property at the time it was stolen[8] or at some time during its receipt, transportation or concealment[9] is essential to conviction of the crime against the United States. The test of the sufficiency of such proof on motion for judgment of acquittal is whether, taking the view most favorable to the Government, a reasonably minded jury might accept the relevant evidence as adequate to support a conclusion of a defendant's guilt *beyond a reasonable doubt*.[10] Considering all of the circumstances, we do not think that Hays' testimony alone was sufficient to meet that test. Among such circumstances, we mention that Hays admitted that the corporation was not paying dividends, was not in operation, that he knew of no sales of the stock, that he had not kept up with the corporation for more than six months or a year before the robbery, and that he had forgotten that the certificates were in his safe and failed to report their loss until after they were returned to him.

To summarize our several holdings as to the $5,000.00 limitation in 18 U.S.C. § 2314, (1) we agree with the district court that the owner's testimony is some relevant evidence as to the value of the stock;[11] (2) we hold that the district court clearly erred in charging the jury that value of the securities to the owner is one reasonable method of determining their value [App. 410]; (3) we hold that the owner's testimony of value alone was insufficient to support the verdicts of guilty because the presumption of the owner's special knowledge of the market value of the stock was so nearly negated by his own testimony as to render that testimony of little probative value.

Thus one of the grounds for which the judgments of conviction must be reversed is the denial of each defendant's motion for judgment of acquittal. It is, nonetheless, true that if the Government can produce additional relevant evidence of the market value of the stock and elects to require the defendants to stand trial again, that will not place them twice in jeopardy in violation of the Fifth Amendment.[12]

The judgments of conviction are therefore reversed and the case is remanded for such further proceedings, judgments, or orders as are consistent with the foregoing opinion.

Reversed and remanded.

8. United States v. Tippett, 4 Cir. 1965, 353 F.2d 335, 337.

9. United States v. Riso, 7 Cir. 1968, 405 F.2d 134, 137.

10. Riggs v. United States, 5 Cir. 1960, 280 F.2d 949, 954, 955.

11. With respect to the market value of corporate stock, the cases are in conflict as to whether the mere fact of ownership qualifies the owner to testify as to his opinion. See 32 C.J.S. Evidence, § 546(123) and cases collected in Note 75 on page 488; United States v. Sowards, 10 Cir. 1966, 370 F.2d 87, 92; Berkshire Mutual Ins. Co. v. Moffett, 5 Cir. 1967, 378 F.2d 1007, 1010; Adams v. Erickson, 10 Cir. 1968, 394 F.2d 171, 173.

12. Bryan v. United States, 1950, 338 U.S. 552, 560, 70 S.Ct. 317, 94 L.Ed. 335; Forman v. United States, 1960, 361 U.S. 416, 425, 426, 80 S.Ct. 481, 4 L.Ed.2d 412; see also North Carolina v. Pearce, 1969, 395 U.S. 711, 719–721, 89 S.Ct. 2072, 23 L.Ed.2d 656.