**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Daniel C. LAUGHLIN,
Defendant-Appellant.**

No. 86–3012.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1986.

Royal B. Martin, Jr., Chicago, Ill. (Court-appointed), for defendant-appellant.

Stanford O. Bardwell, U.S. Atty., Ian F. Hipwell, Asst. U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

Following a three day bench trial, presided over by District Judge Frank Polozola, Dr. Daniel G. Laughlin was convicted of transporting stolen property across state lines in violation of 18 U.S.C. § 2314 and of aiding and abetting the receipt of stolen property shipped in interstate commerce in violation of 18 U.S.C. § 2315. Dr. Laughlin appeals, asserting that the Government failed to prove beyond a reasonable doubt that the white tiger cubs he stole had a market value of $5,000, thereby failing to meet the statutory jurisdictional requisites.

Value is to some extent inherently subjective; its measurement is nearly metaphysical. The conundrum of determining

the "true" value of an object has long puzzled various pundits, including economists, philosophers and legal scholars. Shakespeare described the chimerical nature of value in the following colloquy between Hector and Troilus, restating a conflict as old as the existence of Platonic forms:

Hect. Brother, she is not worth what she doth cost
The keeping.
Tro. What's aught but as 'tis valued?
Hect. But value dwells not in particular will,
It holds his estimate and dignity
As well wherein 'tis precious of itself
As in the prizer....

W. Shakespeare, *Troilus and Cressida* (II, ii, 51–56), *reprinted in The Riverside Shakespeare* 461 (G. Evans ed. 1974).

■ Congress determined that value for jurisdictional purposes would not be established by reference to a "particular will" nor by reference to some intrinsic measure of worth. Rather, the criminal statutes under which Dr. Laughlin was convicted assess value only by reference to costs in a market. In the white tiger market, valuation cannot be established with exactitude by reference to Dow Jones averages. Nor is there a Standard & Poor's in the jungle. The record thus is necessarily fraught with opinion testimony. But as we explain below, the Government abundantly proved that "the prizers" valued tiger cubs of the kind stolen by Dr. Laughlin at well over $5,000. We thus unhesitatingly affirm Dr. Laughlin's conviction.

## I.

Dr. Laughlin was the chief veterinarian for the Ringling Brothers, Barnum & Bailey Circus. During the first week of August 1984, while the circus was on tour in Oregon and Washington, two female tigers owned by John Cuneo each gave birth to a litter of white tiger cubs.[1] "Snowy," a white tiger, gave birth to three white cubs, one of which died shortly after birth. "Targa," a gold tiger, also gave birth to three white cubs, all of which initially survived. Targa and Snowy were leased by Cuneo to perform as artists in a nine white- and six gold-tiger act at the greatest show on earth.

Dr. Laughlin secreted the five, presumably distraught cubs from their mothers, and shipped them to one Raymond Nicholas Long of the Exotic Feline Survival Association in Springfield, Louisiana. Unlike a ringmaster proudly presenting the next act, Dr. Laughlin—using the alias "Dr. Johnson"—shipped the cubs on a midnight flight from Seattle to New Orleans in an airline kennel mendaciously marked "one Angora cat."

Initially, Dr. Laughlin denied that he had taken the cubs and claimed that they had either been lost or killed by their mothers—a not infrequent practice among tigers. But in November, Dr. Laughlin admitted in a self-serving letter to Cuneo, who had been frantically searching for the wayward animals, that he had taken the cubs. Dr. Laughlin claimed that he had sent the cubs to Long for health reasons. On November 6, 1984, FBI agents found three live cubs and two dead cubs—which had been preserved in a freezer—at Long's facility, and on November 28, Cuneo reclaimed the survivors.

Dr. Laughlin was charged in a single indictment with one count each of violating 18 U.S.C. §§ 2314[2] and 2315,[3] and was

---

**1.** There are various descriptions in the record of "white tigers." All the experts agreed that a white tiger is one whose body color is white rather than gold or orange, and whose stripes are chocolate brown rather than black. White tigers are not a distinct species of tiger. These special characteristics result from the pairing of recessive, mutated genes, which occurs infrequently in the wild. We have determined from the record that white tigers, even as cubs, appear to be beautiful animals and are often, although not always, coveted by circuses and zoos because of their propensity to draw people to the gate.

**2.** 18 U.S.C. § 2314 provides:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or

found guilty by Judge Frank Polozola. Dr. Laughlin takes this appeal, claiming that the Government failed to prove beyond a reasonable doubt that the stolen tiger cubs had a market value of at least $5,000.

## II.

We recently reiterated the appropriate standard for reviewing the sufficiency of the evidence in a criminal bench trial in *United States v. Marchant*, 803 F.2d 174, 176 (5th Cir.1986) (*quoting United States v. Niver*, 689 F.2d 520, 529 (5th Cir.1982)).

[W]e must consider the evidence in the light most favorable to the government. Our task is not to reweigh the evidence or to determine the credibility of the witnesses, and we must affirm the verdict if it is supported by substantial evidence. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).... "The test is whether the evidence is sufficient to justify the trial judge, as trier of facts, in concluding beyond a reasonable doubt that the defendant was guilty...." *Gordon v. United States*, 438 F.2d 858, 868 n. 30 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); *United States v. Hull*, 437 F.2d 1, 3 (5th Cir. 1971); *see generally* 3 C. Wright, *Federal Practice and Procedure* § 374 (1982).

In sum, our task is to review the entire record to ascertain " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (*quoting Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

■ Despite Dr. Laughlin's assertion to the contrary, the scope of our review is not altered because the Government may have relied in part on circumstantial evidence to prove its case. *See, e.g., Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); *United States v. Weddell*, 800 F.2d 1404, 1407 (5th Cir.1986). " '[T]he standard for review of the sufficiency of the evidence to support the conviction is the same whether the evidence is direct or circumstantial.' " *United States v. Bryant*, 770 F.2d 1283, 1288 (5th Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 1235, 89 L.Ed.2d 343 (1986) (*quoting United States v. Hillburn*, 625 F.2d 1177, 1180 (5th Cir.1980)).

■ An essential element of proof required to obtain a conviction under 18 U.S.C. §§ 2314 and 2315 is that the stolen property have a value of at least $5,000. *See, e.g., United States v. Perry*, 638 F.2d 862, 864–65 (5th Cir.1981); *United States v. Robinson*, 687 F.2d 359, 360 (11th Cir. 1982). The definition of value for the purposes of §§ 2314 and 2315 is supplied by 18 U.S.C. § 2311:

"Value" means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof.

■ The requisite market value of the stolen white tiger cubs thus must be proved beyond a reasonable doubt to have met or exceeded $5,000. *See, e.g., Perry*, 638 F.2d at 864–65; *Robinson*, 687 F.2d at 360. Market value may be determined not only at the time of the theft, but also at any time the stolen property was in the possession or control of the defendants.

---

more, knowing the same to have been stolen, converted or taken by fraud ...

....

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**3.** 18 U.S.C. § 2315 provides:

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as se-

curity for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken ...

....

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

*See, e.g., Robinson,* 687 F.2d at 360; *United States v. Reid,* 586 F.2d 393, 394 (5th Cir.1978), *cert. denied,* 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). Because a single indictment charged Dr. Laughlin with stealing the cubs, the relevant value is the aggregate value of the five cubs in the market. 18 U.S.C. § 2311; *see, e.g., Perry,* 638 F.2d at 870.

Considerable evidence was adduced at trial as to the market value of white tigers. Cuneo's cats all derive from a gold sire, "Tony" the tiger. No evidence was presented to establish, and it is unlikely, that Tony was the model for the famous Kellogg's Frosted Flakes commercials in which an animated Tony the Tiger proclaims: "It's g r-r-r-eat!!!" There was, however, a "g r-r-r-eat" deal of evidence showing that Tony was the distinguished progenitor of a line of white tigers at the Cincinnati Zoo that consistently fetch prices in the open market ranging from $45,000 to $60,000 per cat. Further, although Cuneo's tigers have genetically diverged from the line of white tigers bred at the Cincinnati Zoo, Edward Maruska (the Zoo Director) testified that he would gladly pay $5,000 for any one of Cuneo's cats. Maruska also testified, as the director of the largest breeding and selling program of white tigers in the world, that he had sold one-day-old cubs and three-month-old cubs for the same prices as adults.

Cuneo testified that the market value for white tigers, based on "innumerable" offers he received and subsequently collected in his files for tax purposes, is far greater than $5,000 per cub. According to both Maruska and Cuneo, there is no difference in the market price of one-day-old cubs and young adults, because of the great surplus in demand for white tigers. Finally, although Cuneo never sells his white tigers, he leases them to perform with various circuses. His unrebutted testimony shows that he garners a net rental income of approximately $16,000 per white tiger per year.

Dr. Laughlin asserts that the Government's evidence is insufficient to sustain a conviction beyond a reasonable doubt, and he advances several theories that purport to support his assertion. First, Dr. Laughlin argues that the Government failed to introduce any competent evidence of the market value for the particular tiger cubs at issue. Dr. Laughlin asserts that the trial judge erred by admitting Cuneo's testimony, because it was "subjective," "inadmissible hearsay," or at best "wild speculation."

This argument is without merit. It is well-settled that the owner of stolen property may testify as to its market value. "[T]he owner of property is qualified by his ownership alone to testify as to its [market] value." *LaCombe v. A–T–O, Inc.,* 679 F.2d 431, 433 (5th Cir.1982); *see Dietz v. Consolidated Oil and Gas, Inc.,* 643 F.2d 1088, 1094 (5th Cir.1981), *cert. denied,* 454 U.S. 968, 102 S.Ct. 513, 70 L.Ed.2d 385 (1981); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698 (5th Cir.1975), *modified on other grounds en banc,* 575 F.2d 564 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). "While courts will not permit testimony on the mere subjective value to the individual owner of the property, the owner's testimony on the objective market value of the property is relevant." *United States v. Robinson,* 698 F.2d 448, 456 (D.C. Cir.1983) (per curiam) (*citing United States v. Nall,* 437 F.2d 1177 (5th Cir. 1971)); *see United States v. Lehning,* 742 F.2d 1113, 1115 (7th Cir.1984).

■ The fact that Cuneo expressed his "opinion" that the five cubs had a market value of greater than $5,000 neither renders the evidence subjective nor speculative. Dr. Laughlin miscomprehends the meaning of "subjective value" in this context. "Subjective" testimony does not mean testimony rendered when expressing an opinion as to the market value. Such a definition would render inadmissible all testimony as to market value, since "market value" by definition can be no more than an opinion based on one's knowledge of various offers and acceptances for a comparable good. Rather, "subjective" testimony

designates testimony that addresses the idiosyncratic value attached to particular property by its owner or "prizer." For example, an old, cracked mirror that is a family heirloom may be subjectively priceless to the owner, but may have little objective value on the market. Such subjective testimony, unlike Cuneo's opinion testimony, plainly would be inadmissible to show market value. Cuneo's opinion as to the market value of his stolen cubs, based on "innumerable" offers and on his knowledge of offers received by the Cincinnati Zoo, was neither subjective nor speculative. It was properly admitted.

■ As the trial judge properly ruled, Cuneo's testimony also was not inadmissible hearsay. An owner's testimony is within the scope of the expert opinion exception to hearsay provided by Federal Rule of Evidence 702. *See, e.g., LaCombe,* 679 F.2d at 433 n. 4; *Kestenbaum,* 514 F.2d at 698–99; *South Central Livestock v. Security State Bank,* 614 F.2d 1056, 1061 (5th Cir.1980). Nor does the fact that Cuneo's testimony was based on offers for similar cubs, rather than on offers for the particular cubs that Dr. Laughlin stole, render the testimony inadmissible hearsay. *See La-Combe,* 679 F.2d at 434 & n. 5, 435; *Robinson v. Watts Detective Agency,* 685 F.2d 729, 739 (1st Cir.1982), *cert. denied sub nom. Consolidated Service Corp. v. Robinson,* 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983); *United States v. Featherston,* 325 F.2d 539, 542–43 (10th Cir.1963); *see generally* J. Wigmore, 3 *Wigmore on Evidence* § 719, at 61–62 (Chadbourn rev. ed. 1970). In short, the trial judge properly admitted Cuneo's opinion testimony of the market value of the stolen cubs and of white tigers generally, and properly permitted Cuneo to supply the bases of his opinion.

■ Dr. Laughlin next asserts that because Cuneo did not sell his white tigers but only leased them to circuses, the relevant market is the lease market, not the sales market. Dr. Laughlin therefore concludes that his conviction should be reversed, since the Government allegedly failed to introduce any evidence as to the value of stolen tiger cubs in the lease market.

Assuming that Dr. Laughlin's choice of the lease market were proper,[4] that choice would not assist Dr. Laughlin's cause. Cuneo testified without challenge that he leased adult white tigers to the Circus Krohner for a net rental income of $16,000 per cat per year. It is true that no evidence was introduced as to the lease value of white cubs at the age of those stolen by Dr. Laughlin. But there was substantial, unrefuted testimony that the tiger cubs at an age of less than four months had the same value in the sales market as young adults. The mortality rate and costs of raising cubs of this age thus are not so great as to reduce the value or desirability of white tigers. Therefore, viewing all inferences favorably to the government, we have no difficulty concluding that any reasonable trier of fact could find beyond a reasonable doubt that the aggregate present discounted value of the five white tiger cubs in the lease market was at least $5,000.

Dr. Laughlin finally argues that, even if properly admitted, the market evidence itself was too speculative to establish that the stolen white cubs had a value of at least $5,000, and thus was insufficient to support the conviction. *Cf. United States v. Chandler,* 586 F.2d 593, 602 (5th Cir. 1978), *cert. denied sub nom. Morrow v. United States,* 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). Dr. Laughlin asserts that the expert testimonial evidence, showing that Cuneo's tigers had substantially diverged in genotype from the Cincinnati Zoo tigers, renders the market comparison of little probative value. Dr. Laughlin

---

**4.** Dr. Laughlin analogizes to those cases in which we have held that the relevant market is the wholesale market, not the retail market, if the owner of the goods stolen only sells on a wholesale basis. *Perry,* 638 F.2d at 864, 865; *Robinson,* 687 F.2d at 360. Although the analogy has merit, we reserve judgment for a case in which the issue is presented more squarely, *viz.* for a case in which the jurisdictional requisite is met in only one of the two possible markets.

presented expert testimony purporting to show that the Cuneo cats had diverged in genotype significantly and to their detriment from the Cincinnati cats, despite their common ancestor, Tony. These experts testified that Cuneo's cats were very inbred, subject to congenital spinal deformities, stabismus, and immuno-deficiency syndrome (tiger-AIDS). The experts further testified that due to outcrosses, the Cincinnati gene pool resulted in much "thriftier" cubs.

Even were there marked differences in physical value between sales-market cubs and Cuneo's putative mutants, a reasonable trier of fact could still infer beyond a reasonable doubt that the five tiger cubs had an aggregate market value of at least $5,000. Maruska testified that he would pay $5,000 for any of Cuneo's cubs. Cuneo testified that he had received many offers for his white tigers at prices ranging from $45,000 to $60,000. According to Cuneo, even gold tiger cubs have a sales market value of between $800 and $1,000. Moreover, the experts' geneological testimony comparing the Cuneo and Cincinnati lines is ultimately less than persuasive. But there is no sense belaboring the point.[5] On this record, it simply strains credulity to believe that the Cincinnati Zoo could sell two white, one-day-old cubs for $50,000 apiece, while Cuneo could not sell five white cubs of roughly the same age for $1,000 apiece.

In an effort to buttress his argument that there was insufficient evidence to support his conviction, Dr. Laughlin points to Judge Polozola's inability to value the tiger cubs for restitution purposes, pursuant to the Victim and Witness Protection Act, 18 U.S.C. § 3663(d). This logic is specious.

Based on the record at the criminal trial, Judge Polozola found it difficult to establish *precisely* the tigers' value for restitution purposes, and therefore ordered that restitution be set following a civil trial.

This order does not in any way detract from the propriety of the verdict in the case *sub judice*. Even were Judge Polozola unable to establish *precisely* the market value for restitution purposes, this falls far short of establishing that the cubs were not worth an amount equal to or greater than $5,000. The only issue presented in the criminal trial respecting valuation was whether the aggregate market value of the five stolen cubs was at least $5,000. In establishing restitution, by contrast, the judge must take into account that three of the white tiger cubs have been returned to Cuneo. Thus, market value is not the only issue. Further, the court must consider the fact that Cuneo is not able to ascertain from which of the two litters the remaining three tigers came, causing a diminution in their breeding value since proper pedigree records cannot be kept for any progeny the remaining cubs might produce. These issues were irrelevant to the criminal trial, and thus a restitution determination was properly put off until a relevant proceeding.

## CONCLUSION

P.T. Barnum is credited with saying, "[t]here's a sucker born every minute." This court is not a circus, however, and we are convinced that a reasonable trier of fact could conclude beyond a reasonable doubt that the five stolen white tiger cubs were worth at least $5,000 either in the sales market or in the lease market. The judgment is AFFIRMED.

---

**5.** Our study of the geneological history of the two lines leads us to conclude that the genotypes are roughly comparable. Maruska testified to the equivalence in genotype, phenotype, and market value of the Cuneo and Cincinnati cats. We therefore see no reason to clutter the analysis with page after page of tigroid "begats." *Cf. Genesis.*