IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-41250
_____


UNITED STATES OF AMERICA,

                                    Plaintiff-Appellee,

                    versus

YOPHES ONYIEGO, also known as Yophes Onyanuo,
also known as Eric Ombui; ISAAC KIPKURUI
BIEGON; MAHMOOD KHAN LODHI, also known as Mike
Lodhi,

                                    Defendants-Appellants.
_____

            Appeals from the United States District Court
                 for the Eastern District of Texas
_____

                         March 15, 2002

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

      Yophes Onyiego, Isaac Biegon, and Mahmood Lodhi were among six

people convicted for carrying out a conspiracy to traffic in stolen

airline tickets.  Lodhi was allegedly the mastermind behind the

conspiracy.  Biegon and Onyiego allegedly served as ticket brokers

-- selling and using the false tickets.  Each defendant challenges

the sufficiency of the evidence supporting his conviction.

Specifically, Biegon challenges the government's use of the price

1

written and filled in on the blank airline tickets by a co-conspirator as evidence of the "face value" of those tickets. Biegon contends that this value is false -- insofar as it was "made-up" by his co-conspirator -- and therefore cannot be used to establish the "$5000-or-more" jurisdictional element of the crime of interstate transportation of stolen goods. We refuse to read any sort of "truth" requirement into the jurisdictional element of this criminal statute. We hold that the face value of a stolen good is the value affixed to the face of that good. We therefore affirm the conviction of Biegon. We also affirm the sentences of his co-defendants, Onyiego and Lodhi. Finally, we reverse the restitution award because the award included unrecoverable consequential damages.

I

On May 9, 1997, Lodhi, along with three teenage boys, burglarized Dimension Travel. On the day of the burglary, Lodhi rounded up the three teenagers -- one of whom was his son -- to help him accomplish the crime. Lodhi told the teenagers that he had already checked out Dimension Travel. He instructed them to look for blank airline tickets once inside the travel agency. On the night of the burglary, Lodhi drove to Dimension Travel, dropped off the teenagers, and waited while the crime was committed. The teenagers broke through a glass window in the front of the agency and proceeded to steal three thousand blank airline tickets. The

2

teenagers then deposited the stolen tickets in the back of Lodhi's Cadillac.

Before the burglary, Lodhi was sought out by Kamran Burney, who hoped to secure some blank airline tickets. Burney had the computer software necessary to forge blank airline tickets. In particular, he could use his computer to fill in the price, destination, airline, and date of travel on the blank airline tickets. Lodhi told Burney that he could get him some blank tickets but that a down payment was required. Burney gave Lodhi a $2000 down payment. Lodhi promised delivery of the tickets within a few days. Before receiving the tickets, Burney recruited various people to broker the stolen tickets, including Onyiego and Biegon. He instructed the brokers to call him with customer information so that he could then fill in the blank tickets. He further instructed the brokers that if anyone should inquire about the source of the tickets they should lie and claim they got the tickets through 1-800-flyer. Lodhi delivered the stolen tickets to Burney, who then began trafficking the tickets through Biegon, Onyiego and others.

Biegon ran a travel agency, Zooken Travel. Burney sold Biegon 10 to 12 stolen tickets for between $200 and $300 per ticket. Biegon later sold these stolen tickets for upwards of $1400. Burney delivered the tickets to Biegon at his travel agency and in a parking lot.

3

Onyiego bought a number of tickets from Burney and then resold the tickets. On one occasion, Onyiego told a customer not to confirm the tickets because the ticket was "no good." On another occasion, Onyiego advised a customer to lie to the FBI and say he received the tickets, not from Onyiego, but from Eric Ombui. Onyiego made at least one of his ticket sales in a parking lot in Plano, Texas.

The stolen ticket sales imposed a significant cost on the airlines and Dimension Travel. By the trial date, the airlines had charged Dimension Travel $598,506.60 for the passengers flying on the stolen tickets. This value reflected the sum of the amount filled in by Burney on each stolen ticket.

Upon the referral of the Plano Police Department, the FBI investigated the crime. On April 12, 2000, a federal grand jury returned a two-count indictment against six defendants, including Lodhi, Biegon, and Onyiego. Count One of the indictment charged each defendant with conspiracy to transport stolen goods in interstate commerce. Count Two charged each defendant with the substantive offense underlying the conspiracy charge.

A jury found Onyiego, Biegon, and Lodhi guilty of the interstate transportation of stolen goods and conspiracy to transport stolen goods in interstate commerce. Onyiego was sentenced to 24 months imprisonment and $6,802.80 in restitution. Biegon was sentenced to 9 months imprisonment and $8,275.18 in

4

restitution.  Lodhi was sentenced to 115 months imprisonment and $622,053.84 in restitution.

Each defendant now appeals.[1]

## II

We first address Biegon's challenge to the sufficiency of the evidence to support his conviction for the interstate transportation of stolen goods.  We then address the defendants' challenges to the sufficiency of the evidence underlying their conspiracy convictions.  Finally, we consider the sentencing and restitution issues raised by each defendant.

## A

When reviewing the sufficiency of the evidence, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)(citations omitted)(emphasis in original).

To establish the offense of the interstate transportation of stolen property under 18 U.S.C. § 2314, the government must prove: (1) the interstate transportation of (2) goods, merchandise, wares, money, or securities valued at $5,000 or more and (3) with

---

[1]Each defendant moved for a judgment of acquittal at the close of the government's case and the close of evidence.  We review the denial of these motions de novo, applying the same standard as the district court.  <u>United States v. Ferguson</u>, 211 F.3d 878, 882 (5th Cir.)(citations omitted), <u>cert. denied</u>, 531 U.S. 909 (2000).

knowledge that such items have been stolen, converted, or taken by fraud. See Dowling v. United States, 473 U.S. 207, 214 (1985).

Biegon's sufficiency of the evidence challenge focuses solely on the jurisdictional element of the crime. This element requires that stolen goods transported in interstate commerce have a value of more than $5000. See United States v. Perry, 638 F.2d 862, 865 (5th Cir. 1992)("Proof of the value of the property at the time it was stolen or at some time during its receipt, transportation or concealment is essential to conviction of the crime against the United States.")(quoting United States v. Nall, 437 F.2d 1177, 1187 (5th Cir. 1977)). As we noted in Nall, "While we agree that the $5,000.00 limitation was not designed to protect those who transport stolen property of a lesser value, its effect is to leave the punishment of such persons to the several states and to make the limitation an essential part of the federal crime." Id. at 1187.

The government can prove the value of a stolen good by reference to that good's "face, par, or market value, whichever is the greatest." 18 U.S.C. § 2311. Here, Biegon argues that the government cannot rely on the "face" value of the tickets -- i.e., the value written on the tickets -- to prove the jurisdictional element because this value was simply "made up" and filled in by Burney. Lacking proof of the "face" value, the government, Biegon asserts, has to show that the market or par value of the stolen

6

tickets was enough to satisfy the jurisdictional element.  The tickets in this case were not securities and hence have no par value.  Furthermore, Biegon contends that the government only proved that the market value of the stolen tickets was equal to $3,256 -- an amount insufficient to satisfy the "$5000-or-more" jurisdictional element.  Consequently, Biegon argues that the evidence was insufficient to support his conviction under 18 U.S.C. § 2314.

In contrast, the government argues that it could use the values Burney filled in on the blank tickets to prove the jurisdictional element of the crime.  The government points out that these figures -- although concocted by a co-conspirator -- reflected the price the airlines eventually charged Dimension Travel for the passengers flying on the stolen tickets.

What constitutes the face value of a previously stolen blank airline ticket is an issue of first impression in this Circuit. Nevertheless, we do not write on an entirely clean slate.  We have previously held that the value requirement for a blank money order can be met "by the face value of, or the amount received for, <u>filled in blank money orders</u>, or the value of the blanks in a thieves' market for blank money orders."  See <u>United States v. Wright</u>, 661 F.2d 60, 61 (5th Cir. 1981)(emphasis added)(citing <u>United States v. Bullock</u>, 451 F.2d 884 (5th Cir. 1971)).  We have also held that the "face" value of a fraudulently secured

7

promissory note does not depend on the amount of money eventually obtained in a litigation settlement on that note. Instead, the face value is the figure written on, and the credit given for, the wrongfully obtained note. See United States v. Robinson, 553 F.2d 429, 431 (5th Cir. 1977), cert. denied, 434 U.S. 1016 (1978).

With these cases in mind, we turn to interpret the statute at issue. As noted above, the statute allows the government to define value in any one of three ways: par, market, or face. 18 U.S.C. § 2311. The plain meaning of "face value" is "the value indicated on the face of an instrument." MERRIAM-WEBSTER'S DICTIONARY 812 (3d ed. 1993). There is nothing inherent in the definition of "face value" that insists on this value being -- in any sense -- correct. See United States v. Laughlin, 804 F.2d 1336, 1338 (5th Cir. 1986) ("Congress determined that value for jurisdictional purposes would not be established by reference to a 'particular will' nor by reference to some intrinsic measure of worth."). Nor does the plain meaning of the term mandate that the face value equal the market or par values of the good. In fact, because Congress included three different ways to define "value," a sensible reading of the statute suggests that in many cases a stolen good's face, market, and par values would all be different. Under any other reading, the statute would include surplusage. See Platt v. Union Pacific R. Co., 99 U.S. 48, 58 (1878)("Congress is not to be presumed to have used words for no purpose.").

We see no need to depart from the plain meaning of the statute in this case. The "face" value of a stolen good is the value affixed to the face of that good. In so holding, we follow and make explicit the holdings of <u>Robinson</u> and <u>Bullock</u>. We do not decide today whether the face value of a stolen good includes any figure -- no matter how outlandish -- written on the face of a good. In some cases, the value of a good -- for example, stolen airline tickets that remain blank -- may best be determined by reference to their market value or their value in the thieves' market. The figure written on the face of each stolen ticket in this case, however, was (1) the amount of money eventually charged to Dimension Travel by the airlines and (2) the amount the tickets would have been redeemable for had the tickets not been used. The government provided ample evidence that the tickets sold by Biegon had a combined face value of $8,018. Accordingly, the evidence -- when viewed in the light most favorable to the verdict -- is sufficient to support Biegon's conviction for the interstate transportation of stolen property under 18 U.S.C. § 2314.

B

We now turn to the defendants' challenges to the sufficiency of the evidence underlying their conspiracy convictions.

To establish a conspiracy to transport and sell stolen goods in interstate commerce under 18 U.S.C. § 371, the government is required to prove: (1) an agreement between two or more persons (2)

9

to commit the underlying crimes and (3) an overt act committed by one of the conspirators in furtherance of the agreement. United States v. Anderson, 174 F.3d 515, 522 (5th Cir. 1999)(citing United States v. Burton, 126 F.3d 666, 670 (5th Cir. 1997)). The government must prove that "the defendant[s] knew of the conspiracy and . . . voluntarily became a part of it." United States v. Mackay, 33 F.3d 489, 493 (5th Cir.1994) (internal quotation marks and citation omitted). The conspiracy need not be proven by direct evidence. See Burton, 126 F.3d at 670 (citing United States v. Schmick, 904 F.2d 936, 941 (5th Cir. 1990)). Circumstantial evidence, such as a concert of action, may suffice to prove agreement, but "each link in the inferential chain must be clearly proven." See United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982)(citation omitted).

After reviewing the record in this case, we find that the evidence is more than sufficient to support the conspiracy convictions.

The evidence against Lodhi was substantial. It included (1) testimony that he enlisted the help of three teenage boys in the burglary of Dimension Travel; (2) testimony that he engaged in the burglary of the travel agency after Burney asked him if he could get some blank airline tickets; and (3) testimony that he delivered the tickets at night in various parking lots around town.

The evidence against Onyiego included (1) testimony that he

10

told one of his customers that the tickets were "no good;" (2) testimony that he told one of his customers to lie about the source of the tickets if questioned by the FBI; and (3) testimony that Burney told him to tell his customers that they received the tickets through the 1-800-flyer number.

The evidence against Biegon included (1) testimony that he purchased the tickets from Burney for $200 or $300 and later sold those same tickets for upwards of $1400; (2) testimony that he received, on one occasion, delivery of the blank tickets in the parking lot of Kroger; and (3) testimony that he knew that he should instruct customers to stick with the "1-800-flyer" story if they happened to be questioned about the validity of the tickets.

For the foregoing reasons, the evidence is sufficient to support each defendant's conspiracy conviction.

C

Finally, we address the sentencing and restitution issues raised by each defendant.

1

Biegon challenges the sentence imposed by the district court. He argues that the district court incorrectly used -- when computing the "loss" from the theft for sentencing purposes -- the amount written on the face of the blank tickets. We review the trial court's application of the sentencing guidelines de novo and its findings of fact under the clearly erroneous standard. See

11

United States v. Salter, 241 F.3d 392, 394 (5th Cir. 2001).

As noted above, Biegon was convicted for interstate transportation of stolen goods and conspiracy to transport stolen goods. In cases involving theft or possession of stolen property "Section 2B1.1(b)(1) increases the base offense level on a graduated scale according to the amount of the victims' loss." United States v. Sowels, 998 F.2d 249, 250 (5th Cir. 1993), cert. denied, 510 U.S. 1121 (1994). "Loss" under this sentencing guideline provision means "the value of the property taken, damaged, or destroyed." Application Note 2 to § 2B1.1. Typically, this value is the "fair market value of the particular property at issue." Id.

Biegon argues that the value written on the blank tickets does not reflect the "fair market value" of the tickets. Instead, Biegon contends that the fair market value is better estimated by the amount he actually received for the ill-gotten tickets. We find this argument unpersuasive.

The black market value of the blank airline tickets -- i.e., Biegon's proceeds from the sale of the tickets -- is not the same as the fair market value of those tickets. One assumes that the black market price of a stolen good will reflect a discount from the fair market price (i.e., value) of that good. Few, if any, persons knowingly pay the full market price for a stolen good.

Accordingly, the district court had before it little evidence

12

of the fair market value of the blank airline tickets.  In this sort of case, the application notes to the sentencing guidelines allow the sentencing court to use other reasonable means to ascertain the level of loss to the victim.  Application Note 2 to § 2B1.1 ("Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way.").

Here, the district court measured the loss as the amount billed by the airlines to the victim.  Calculating losses in this fashion was entirely appropriate.  Accordingly, we affirm Biegon's sentence.

2

The district court ordered that Lodhi pay $622,053.84 in restitution.  This amount of restitution included $23,063.98 in legal fees incurred when the victim was forced to defend actions instituted by the airlines seeking to collect on the stolen tickets.

Lodhi argues that these legal fees are not recoverable because they were not directly and proximately incurred as a result of the crime.  The legality of the district court's order of restitution is reviewed de novo.  United States v. Hughey, 147 F.3d 423, 436 (5th Cir.), cert. denied, 525 U.S. 1030 (1998). "Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for

13

an abuse of discretion." Id. (internal citation omitted).

18 U.S.C. § 3663A provides for the mandatory award of restitution in cases such as this one. This section limits the restitution award to either (1) the value of the property on the date of the damage, loss, or destruction or (2) the value of the property on the date of the sentencing less the value (as of the date the property is returned) of any part of the property that is returned. 18 U.S.C. § 3663A(a)(3)(b)(1)(B). This language is the same as the language in the section of the code that deals with the discretionary (as opposed to a mandatory) award of restitution. See 18 U.S.C. § 3663(b). We have interpreted the language of Section 3663(b) to preclude the award of consequential damages. See United States v. Mitchell, 876 F.2d 1178, 1184 (5th Cir. 1989).

The losses here are akin to losses incurred by a victim attempting to recover stolen property. We have specifically held that such "recovery" losses cannot be included in a restitution award under Section 3663(b)(1). Id. at 1184 ("There is no provision [in the restitution Act] authorizing restitution for lost income, cost of restoring property to its pre-theft condition, or cost of employing counsel to recover from an insurance company.")(emphasis added); see also United States v. Schinnell, 80 F.3d 1064, 1070-71 (5th Cir. 1996). Accordingly, we reverse the district court's order granting restitution for the legal fees the victim incurred defending the collection actions by the airlines.

14

In all other aspects, the restitution order is affirmed.

III

We have looked carefully at the record in this case and find unpersuasive the remaining arguments raised by the defendants.  As a consequence, we affirm the convictions and sentences of Onyiego, Lodhi, and Biegon.  In addition, we reverse and remand the restitution assigned to Lodhi insofar as it included the victim's legal fees.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED