[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12273

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 23, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:08-cr-00254-JTC-ECS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES R. BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 23, 2011)

Before HULL, MARCUS and BLACK, Circuit Judges.

PER CURIAM:

After a jury trial, Defendant James R. Brown appeals his convictions for

mail fraud and interstate transportation of forged securities, and his restitution

order of $120,421.59. After oral argument and review of the briefs and record, we affirm.

## I. BACKGROUND

### A. U.S. Treasury Checks Payable to Weinstein

Defendant Brown's convictions arise from events occurring in August 2003. That month, Washington Mutual Group of Funds ("WM Funds") received a new account application from Terry Clark of Consumer Concepts Investments, an investment firm. Clark was Defendant Brown's college friend and financial advisor. Attached to the application were two U.S. Treasury checks, totaling $297,435.83, for the account's opening deposit. The checks, dated February 28, 2003, were made payable to, and allegedly endorsed by, Frank Weinstein. Clark purported to submit the application on behalf of the alleged account holders, Weinstein, Anthony Stringer, and Defendant Brown, as "tenants by entirety" (the "Weinstein account").

The application was mailed from Georgia to WM Funds' Rhode Island location. It requested that the account be linked to a Capitol City Bank account held solely in Brown's name.

When the two checks underwent processing, the bank that opened and serviced mutual fund accounts for WM Funds became suspicious of them and

2

ordered an investigation into the Weinstein account. The investigation revealed that Weinstein did not authorize the deposit of the two U.S. Treasury checks. Thus, the Weinstein account was never funded.

The investigation of the Weinstein checks led to Defendant Brown's indictment in 2008 for his 2003 conduct. The two-count indictment charged Brown with (1) attempting to commit and committing mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Count One); and (2) transporting forged securities in interstate commerce, in violation of 18 U.S.C. § 2314 (Count Two). The indictment described Brown's above conduct as a scheme to defraud, as follows:

> [Defendant] James R. Brown . . . devised and participated in a scheme and artifice . . . to obtain money from the United States by means of false and fraudulent pretenses and representations to the effect that [Frank Weinstein] authorized the establishment of a WM Group of Funds mutual funds account, registered in [Weinstein]'s name, on which defendant JAMES R. BROWN was a registered co-account holder, when in fact, as the defendant, JAMES R. BROWN, then well knew and believed, [Weinstein] did not authorize the establishment of a WM Group of Funds account using [Weinstein]'s name.

Brown pled not guilty.

## B. Rule 404(b) Evidence as to Winnick and Cassidy Checks

Before Defendant Brown's jury trial, the government filed a notice of intent to submit Rule 404(b) evidence: namely, Brown's "two prior fraud schemes" that occurred in late November and early December 2002, involving checks payable to

3

Alexander Winnick and Mark Cassidy. Brown illegally obtained the checks, forged the payees' signatures, and deposited the checks in fraudulent accounts. Brown created the accounts by providing a false social security number for the payees and listing himself as "tenants by entirety" with the payees. The government argued that both schemes, which were nearly identical to the indicted offense, would demonstrate Brown's intent underlying the charged conduct and show absence of mistake or accident.

Brown moved in limine to exclude the proposed evidence for two main reasons. First, the evidence was unnecessary, pursuant to Rule 404(b), because the government claimed to have "overwhelming" evidence of Brown's guilt on the indicted Weinstein-check charges. Second, the evidence was excludable under Rule 403 because its prejudicial effect substantially outweighed its relevance, and its presentation would unduly delay the trial.

On the first day of trial, before voir dire, the district court held a hearing on the admissibility of the Rule 404(b) evidence. The government reiterated its pretrial arguments. Further, the government argued that the evidence was inextricably intertwined and thus not subject to Rule 404(b). Defendant Brown also repeated his pretrial arguments.

The district court inquired as to the government's proof that Brown

4

committed the two prior fraud schemes. After noting that Brown previously claimed he had no knowledge of the 2002 fraudulent transactions but was himself the victim of identity theft, the district court found that the evidence was admissible. The district court concluded that the evidence was "more 404(b) than inextricably intertwined" but determined the danger of prejudice was not greater than the evidence's probative value. Brown then asked for a limiting instruction, which the district court agreed to give.

## C.    Trial Evidence as to Weinstein Account

The government first called John Hickey, an investigations manager for the corporate fraud unit of the bank that processed the Weinstein account on behalf of WM Funds. Hickey identified and discussed a series of exhibits.

Exhibit 1 was the Weinstein account application. The application listed Weinstein, Stringer, and Defendant Brown as tenants by entirety. The application bore their purported signatures and listed their social security numbers and birth dates. The account holders' address was "170 Mapledale Lane, College Park, Georgia," and the application listed two phone numbers, one with a California area code, and the other with a Georgia area code. Clark was named the investment professional. The application included a voided copy of a check for Capitol City Bank. The check stated the account was owned by "a James Brown, 170 Maple

Dale Lane in College Park, Georgia."

Exhibits 2 and 3 were two U.S. Treasury checks, which were payable to Weinstein and which had been attached to the Weinstein account application for deposit. The checks, purportedly endorsed by Weinstein, totaled $297,435.83. During the course of Hickey's investigation of the Weinstein account, Hickey concluded that Weinstein had not authorized the checks to be deposited into the Weinstein account. The account was thus not funded.

The government also called Weinstein's accountant Gregory Lacombe to testify. Lacombe had provided tax and financial consulting services to Weinstein from 1990 until Weinstein's death. In 2002, Lacombe assisted Weinstein in obtaining tax refund checks for the 1977, 1978, and 1979 tax years. Although the original refund checks were issued and mailed around February or March 2003, Weinstein never received them. Lacombe identified the previously introduced Exhibits 2 and 3 as Weinstein's tax refund checks, dated February 28, 2003, for tax years 1977 and 1978. Lacombe had reported the missing checks to the IRS, and the IRS reissued them later that year, one by direct deposit and one by hard copy. Weinstein received the reissued checks.

Lacombe testified that he was personally familiar with Weinstein's signature. Lacombe stated that the signatures on the two original U.S. Treasury

6

checks and the Weinstein account application were not Weinstein's. However, the endorsement on the hard copy reissued check, which was introduced as an exhibit, was Weinstein's signature. Additionally, Lacombe testified that the Weinstein application listed the wrong social security number for Weinstein.

Next, IRS coordinator Gloria Jackson testified that two U.S. Treasury checks, totaling $297,435.83, were issued for tax refunds to Weinstein in February 2003. They were later cancelled, and new checks were issued in May and July 2003.

## D.	Trial Evidence as to Winnick and Cassidy Accounts

The rest of the government's presentation focused on two other fraudulent accounts created by Defendant Brown. Government witness Hickey testified that he recognized Brown's name during his investigation of the Weinstein account from two other WM Funds account applications. Hickey identified two exhibits as WM Funds account applications: one in the name of Brown and Mark Cassidy, and one in the name of Brown and Alexander Winnick. Both applications named the account holders "tenants-by-entirety."

As to the Winnick account, Hickey testified as follows. In late November 2002, the Winnick account was opened with WM Funds. Clark submitted the application on behalf of the account holders. The application listed the same

7

account holder address and phone numbers as the Weinstein account. It also provided Winnick's and Brown's social security numbers. The Winnick account was first linked to a California bank account in the name of All American Legal Systems, Brown's business. Later, the account was linked to Brown's Capitol City Bank account. Only Brown had check-writing privileges on the Winnick account. The opening deposit for the Winnick account was a check purportedly written by Winnick for $9,825.00. However, like the Weinstein account, the account was never funded because a bank investigation revealed that the check was altered and Winnick had not authorized the check's deposit.

Winnick himself testified. He did not know Defendant Brown and had not authorized an application for an account at WM Funds. When shown a check from his account, Winnick testified that he had not written the check and had not given anyone permission to write it. The social security number listed as his on the WM Funds account application was not, in fact, his.

Government witness Hickey also testified about the Cassidy account, which was opened with WM Funds in December 2002. Clark purported to submit the application on behalf of the account holders. The application was purportedly signed by Cassidy and Brown. The application listed Brown's and Cassidy's social security numbers, as well as the same account holder address and phone

8

numbers as the Weinstein and Winnick accounts. Attached to the application was a voided check for an account owned by All American Legal Systems; the check bore one of the same phone numbers as provided for the Weinstein account. Like the Winnick account, the Cassidy account was originally linked to All American Legal Systems' California bank account before being linked to Brown's Capitol City Bank account. Brown was the only person with check-writing privileges on the Cassidy account.

According to Hickey, the opening deposit for the Cassidy account was a U.S. Treasury check for $77,799.04.[1] The first recorded activity on the Cassidy account was a $40,000.00 wire transfer to Brown's Capitol City Bank account in January 2003. Following that transfer, a series of checks made payable to Brown personally, to Clark & Associates, and to various other individuals depleted the Cassidy account to a balance of $609.34. The signature on all of the checks was the signature WM Funds had on file for Brown.

Sherri Cassidy, Mark Cassidy's ex-wife, also testified about the Cassidy account. For the 1997 tax year, the then-married couple filed their taxes together. They anticipated a tax refund of approximately $75,000 but never received the

---

[1]Later in the trial, government witness Lou Ann Finkelstein testified that the check was made payable to Cassidy and his then-wife.

original refund check. The couple then filed a claim with the IRS for a reissuance of the refund check. Because they were married for nearly fifteen years before their divorce, Ms. Cassidy was familiar with Mr. Cassidy's signature. Mr. Cassidy's purported signature on the Cassidy account application was not his signature. The signature on the reissued refund check, however, was Mr. Cassidy's signature.

Although Defendant Brown earlier had filed a motion in limine, he did not contemporaneously object to the Rule 404(b) testimony about the Winnick and Cassidy accounts.

## E.    Other Trial Evidence

The government called Lou Ann Finkelstein, an agent with the Treasury Inspector General for Tax Administration. Agent Finkelstein's job was to investigate allegations of fraud in connection with the IRS, and she was assigned to Defendant Brown's case. After investigating, Agent Finkelstein determined that Brown was a suspect in the case and arrested him in California in August 2008.

After Agent Finkelstein arrested him, Brown waived his Miranda rights and answered a series of questions from Agent Finkelstein. Brown stated that his purported signature on the Weinstein application was his, but he did not know

10

Weinstein, Cassidy, or Winnick. Brown admitted that he had done business with Clark and was familiar with the mutual funds. Finally, Brown claimed that Weinstein had stolen his identity and that Brown needed to talk to Clark.

Agent Finkelstein also obtained Brown's California driver's license with his signature on it. The license was admitted as an exhibit, in addition to other documents, mostly court-related, that Brown had signed in Agent Finkelstein's presence on the day of his arrest.

Next, Agent Finkelstein testified about the Weinstein, Cassidy, and Winnick account applications. On the Weinstein account, Defendant Brown was the only applicant for whom the name, social security number, and date of birth all matched. Agent Finkelstein's testimony about the Cassidy and Winnick transactions largely repeated earlier testimony about the accounts. As to the Cassidy account, Agent Finkelstein did not have a handwriting expert verify that the signatures on the checks and documents were Brown's, because based on their appearance, they looked the same as Brown's signature on his license. Agent Finkelstein also testified that all of the U.S. Treasury checks at issue in the investigation belonged to California taxpayers.

Defendant Brown did not object to Agent Finkelstein's testimony concerning the Cassidy and Winnick accounts. However, after Agent

11

Finkelstein's direct testimony, Brown requested a limiting instruction on the evidence's permissible uses. The district court instructed the jury accordingly, stating:

> Members of the jury, Defendant is on trial only for the offenses specifically charged in the indictment. And you will have the indictment with you during your deliberations. Now, you have heard evidence during the testimony of Ms. Finkelstein tending to show that at some other time than the statements stated in the indictment of this case, that the Defendant allegedly committed acts similar to the acts that are charged in the indictment. Now, you may consider that evidence not to prove that the Defendant did the acts charged in the case, in this case, but only to prove the Defendant's state of mind. That is that the Defendant acted with the necessary intent and not through accident or mistake.
>
> Now, therefore, when you are considering the evidence, if you find first that the government proved beyond a reasonable doubt that the Defendant did in fact commit the acts charged in the indictment and, two, that the Defendant also committed similar acts at other times, then you may consider the similar acts in deciding whether the Defendant committed the acts charged in this case willfully and not through accident or mistake.

## F.      Brown's Motion for Judgment of Acquittal and Defense Case

After the government rested and outside the jury's presence, Defendant Brown moved for a judgment of acquittal. The district court denied the motion. When the jury returned to the courtroom, Brown made his Rule 29 motion in open court. The court again denied it.

Defendant Brown then presented his case, which consisted of one exhibit: a

certified document from the Georgia Department of Driver Services depicting the photo from and information for Clark's driver's license. After resting, Brown renewed his motion for judgment of acquittal, which the district court again denied.

## G.    Jury Instructions

Without objection from either party, the district court instructed the jury as follows. First, the district court reiterated its previous limiting instruction on the permissible uses of the Rule 404(b) evidence. Second, it instructed the jury on the elements required to convict Brown of violating 18 U.S.C. § 1341, Count One:

> [(1)] that the defendant knowingly devised or participated in a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[; (2)] that the false or fraudulent pretenses, representations, or promises related to a material fact[; (3)] that the defendant acted willfully with an intent to defraud[;] and [(4)] that the defendant used the United States Postal Service by mailing or by causing to be mailed some matter or thing for the purpose of executing the scheme to defraud.

The district court elaborated that "[t]o act with the intent to defraud means to act knowingly and with the specific intent to deceive or cheat someone[,] ordinarily for the purpose of causing some financial loss to another, or bringing . . . some financial gain to oneself." Third, as to Count Two, the district court instructed the jury that the elements required to convict Brown of violating 18 U.S.C. § 2314

13

were:

> [(1)] [That] the defendant transported or caused to be transported in interstate commerce items of stolen property or items of converted property as described in the indictment[; (2)] that the items had a value of $5,000 or more[; [a]nd (3)], that the defendant transported the items willfully and with knowledge that the securities had been stolen or converted.[2]

Ultimately, the jury convicted Brown on both counts.

## H.    The Restitution Calculation and the Sentencing Hearing

Defendant Brown's Presentence Investigation Report ("PSI") recommended restitution of $120,421.59.  The PSI arrived at this figure by combining four figures: $12,671.32 in checks forged from Winnick's account; $77,799.04 from a U.S. Treasury refund check payable to the Cassidys; $9,841.00 from a U.S. Treasury refund check payable to Anthony Stringer; and $20,110.03 from a U.S. Treasury refund check payable to Weinstein, which was a third tax refund check sent to Weinstein.  The indictment mentioned none of these checks.

Brown objected to the PSI's restitution calculation.  He conceded that the

---

[2]The district court's instruction on this count mirrored the government's proposed instruction submitted prior to trial.  However, while the jury was excused and the district court was preparing for a recess, the government stated that the charge should be in accordance with "the third subsection of [§ 2314]," which does not contain the $5,000-or-more value element. Nonetheless, following the recess and after having an opportunity to review the court's proposed jury instructions, the government stated that it "had an opportunity to review the instructions and the government has no objections."  The government also did not object to the stated charge before the jury retired.

Stringer and Weinstein check amounts, respectively $9,841.00 and $20,110.03, were correctly included in the calculation. However, Brown argued that the Winnick and Cassidy check amounts, respectively $12,671.32 and $77,799.04, were improperly included because those losses fell outside of the discrete scheme charged in the indictment.

At the sentencing hearing, Brown reiterated his arguments on the restitution calculation. The government responded that the Cassidy and Winnick transactions were not included in the indictment because they were outside the statute of limitations. Nonetheless, the government argued restitution for these accounts was due under this Court's precedent.

The district court overruled Brown's objection. The court found that "the evidence shows that the scheme included the Cassidy and Win[n]ick checks, the way of accomplishing that was the same." Concluding that the applicable law "holds that you can award restitution for other victims of the same scheme, even though it wasn't the scheme that was the subject of the indictment," the district court found the restitution owed was $120,421.59.

After hearing the parties' arguments on the 18 U.S.C. § 3553(a) factors, the district court sentenced Brown to 30 months' imprisonment on both counts, to be served concurrently. The district court imposed a restitution order of $120,421.59.

This appeal followed.

## II. DISCUSSION

### A. Rule 404(b) Evidence

On appeal, Defendant Brown argues that the district court improperly admitted the Rule 404(b) evidence. Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts" is inadmissible to prove the defendant's bad character in order to show conduct in conformity therewith. However, such evidence is admissible for other purposes, such as to prove intent or absence of mistake. Fed. R. Evid. 404(b). Even if otherwise admissible, the evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . or by considerations of undue delay." Fed. R. Evid. 403. A limiting instruction can diminish any unfair prejudice caused by the evidence's admission. See United States v. Spoerke, 568 F.3d 1236, 1251 (11th Cir. 2009).

We ordinarily review for abuse of discretion the district court's evidentiary ruling. United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005). However, "the overruling of a motion in limine does not suffice" for preservation of an objection on appeal. United States v. Khoury, 901 F.2d 948, 966 (11th Cir. 1990). Here, Defendant Brown objected to the 404(b) evidence in his pretrial

16

motion in limine but failed to renew his objection when the evidence was presented at trial.  Because Brown failed to preserve his claim of evidentiary error, we would review only for plain error.[3]  See id.

In any event, under any standard of review, we conclude the district court committed no error in admitting the 404(b) evidence.  First, the Weinstein and Cassidy checks were relevant to an issue other than Brown's character: proving both Brown's intent with respect to the charged offense and the absence of mistake.  Brown contested the issue of intent, asserting that he was a victim of identity theft in the Weinstein transaction.  Yet his claim was belied by the remarkable similarity between the Cassidy and Winnick transactions and the Weinstein transaction, not to mention that Brown was the only account holder in all three accounts with check-writing privileges.  The Cassidy and Winnick transactions were relatively close in time to the Weinstein transaction, having occurred less than a year earlier.  The 404(b) evidence was highly probative on the issue of Brown's intent.

---

[3]To establish plain error, the defendant must show that "(1) there is an error; (2) that is plain or obvious; [and] (3) affect[ed] the defendant's substantial rights in that it was prejudicial and not harmless."  United States v. Hoffman-Vaile, 568 F.3d 1335, 1340 (11th Cir. 2009) (internal quotation marks omitted).  If that showing is met, we must then determine whether the error seriously affected the fairness, integrity, or public reputation of the district court proceedings.  United States v. Bradley, 644 F.3d 1213, 1293 (11th Cir. 2011).  If so, only then will we consider whether the defendant is entitled to relief.  Id.

Second, prior to admitting the evidence, the district court inquired as to whether the government had sufficient proof of the extrinsic acts. Third, the district court gave a limiting instruction to the jury, which cured "[a]ny possible unfair prejudice" posed by the 404(b) evidence. See Spoerke, 568 F.3d at 1251. Accordingly, the district court committed no error, plain or otherwise, by admitting evidence of the Cassidy and Winnick transactions.

**B.    Sufficiency of the Evidence at Trial**

Defendant Brown contends that the evidence presented to the jury was insufficient to sustain his two convictions. We review de novo challenges to the sufficiency of the evidence. United States v. Langford, 647 F.3d 1309, 1319 (11th Cir. 2011). We "tak[e] the evidence in the light most favorable to the government and draw[] all reasonable inferences in favor of the jury's verdict." Id. A conviction must be upheld unless a rational fact-finder could not have found the defendant guilty under any reasonable construction of the evidence. Id.

1.    Conviction for Mail Fraud

Brown argues that there was no evidence indicating he acted with intent to defraud or he knew the transaction was fraudulent. However, viewing the evidence in the light most favorable to the government and the jury's verdict, we conclude the evidence was more than sufficient to support Brown's conviction on

mail fraud in Count One.

The government's evidence demonstrated striking similarities among the Weinstein, Winnick, and Cassidy transactions. Brown was the one constant thread in all three WM Funds account applications. But the similarities were much greater than Brown purporting to be "tenants by entirety" with the victim payees of stolen and forged securities in each account. All three transactions occurred within a span of less than a year and involved fraudulently obtained checks, and the Weinstein and Cassidy accounts both involved U.S. Treasury tax refund checks. Even the manner in which the accounts were established was identical—each account was opened with the same mutual fund company (WM Funds); linked to Brown's Capitol City Bank account; gave only Brown check-writing privileges; listed the same account holder address and phone numbers; submitted by the same person, Clark; and correctly provided only Brown's signature, date of birth, and social security number.

Moreover, Brown stated that he did not know the named beneficiaries on the checks and was in fact a victim of identity theft. Yet Brown was the only account holder who stood to benefit from the beneficiaries' checks. Indeed, in the Cassidy account, Brown did benefit, for some of the checks written on the account were made payable to Brown himself. The evidence showed that the only other

19

"tenants" on these accounts were all unknowing victims. A reasonable jury could use evidence of the prior Cassidy and Winnick transactions and of Brown's apparent use of the ill-gotten funds to support an inference of intent to defraud on the charged Weinstein conduct. In addition, the jury could reasonably rely on this evidence to negate Brown's defense at trial that he was himself the victim of identity theft.

2.      Section 2314 Conviction for Interstate Transportation of Forged Securities

Brown argues his conviction for interstate transportation of forged securities, in violation of 18 U.S.C. § 2314,[4] was not supported by any evidence that he knew the securities were stolen or forged and that the checks had a value of $5,000 or greater at the time he committed the crime. We are not persuaded.

---

[4]The statute reads in salient part:
> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or
> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more; or
> Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited . . .
> Shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2314.

As to Brown's knowledge, we conclude, for the same reasons stated above, that the evidence was sufficient for the jury to infer Brown's knowledge that the securities were stolen or forged.

As to the $5,000-or-more value element,[5] we must construe, as a preliminary matter, the statutory meaning of "value" before we can determine whether the evidence was sufficient. The statutory interpretation issue, one of first impression in this circuit, is whether the value element is satisfied by the amount payable written on the face of the checks, when the checks themselves were cancelled months before they were transported in interstate commerce and were thus worthless.

We begin with the language of the statute. See United States v. Acosta, 421 F.3d 1195, 1197 (11th Cir. 2005). The relevant portion of § 2314 requires the checks to have a value of at least $5,000, although § 2314 does not define what suffices for value. However, as § 2314 is within Chapter 113 ("Stolen Property") of Title 18 of the U.S. Code, that chapter's definition section, § 2311, is instructive. Section 2311 provides that value is "the face, par, or market value,

---

[5]The government's brief argues that the jury could have convicted Brown on the third subsection of 18 U.S.C. § 2314, which does not contain a minimum value amount. However, the jury was instructed, without government objection and based on the government's original request to charge, that the government was required to prove that the checks had a value of $5,000 or more. We thus examine the sufficiency of the evidence in light of the jury instruction.

21

whichever is the greatest."  Although "face" value is not further defined, we have little trouble concluding that the plain meaning of face value is the value indicated on the face of the instrument.

Although we have not squarely addressed what face value means under § 2311, the Fifth Circuit has, reaching the same conclusion.  In United States v. Onyiego, the Fifth Circuit considered defendant Issac Biegon's challenge to his § 2314 conviction for a conspiracy to traffic in stolen airline tickets on the ground that the government failed to establish the "'$5000-or-more' jurisdictional element."  286 F.3d 249, 251 (5th Cir. 2002).  One co-conspirator had stolen blank airline tickets and given them to another co-conspirator, who used his computer to fill in the prices.  Id. at 252.  Defendant Biegon then sold the forged tickets through his travel agency.  Id.  At trial, the government relied on the face value of the tickets to satisfy the jurisdictional element.  Id. at 253.  On appeal, Biegon argued that the government could not rely on face value because the face value was "made up."  Id. (internal quotation marks omitted).

The Fifth Circuit rejected Biegon's argument.  After noting § 2311's definition of value, the court stated that it had accepted before the face value of "filled in blank money orders" and previously referred to face value as "the figure written on, and the credit given for, [a] wrongfully obtained note."  Id. at 253–54

(citing United States v. Wright, 661 F.2d 60, 61 (5th Cir. 1981); United States v.

Robinson, 553 F.2d 429, 431 (5th Cir. 1977)).  The court then considered the

statute's plain meaning, defining face value as "the value indicated on the face of

an instrument."  Id. at 254 (quoting MERRIAM-WEBSTER'S DICTIONARY 812 (3d

ed. 1993)) (internal quotation marks omitted).  Declaring that "[w]e see no need to

depart from the plain meaning of the statute in this case," the Fifth Circuit held

that "[t]he 'face' value of a stolen good is the value affixed to the face of that

good."  Id.

Although the Fifth Circuit is the only circuit to define face value directly

under § 2311, the Ninth Circuit has interpreted face value under 18 U.S.C. § 641's

materially equivalent definition of value.[6]  See United States v. Sargent, 504 F.3d

767 (9th Cir. 2007).  Sargent involved a challenge to a conviction for theft of

public property in violation of § 641.  Id. at 769–70.  The defendant, an employee

of the U.S. Postal Service, had stolen postage statements from bulk mailings,

thereby preventing funds from being collected for the mailings.  Id. at 768–69.

The defendant argued that the district court erred in finding that the face value of

the postage statements exceeded $1,000, which was necessary for the assessed

---

[6]Section 641 defines "value" as "face, par, or market value, or cost price, either wholesale
or retail, whichever is greater."  18 U.S.C. § 641.

23

penalty pursuant to § 641.  Id. at 769.

In evaluating the defendant's claim, the Sargent court also looked to the plain meaning of face value.  Id. at 770.  The Ninth Circuit, after observing that "[t]he statute does not define face value," stated that face value's plain meaning is "the value indicated on the face of a financial instrument."  Id.  Moreover, the Ninth Circuit interpreted value under § 641 consistently with § 2311, and quoted the Fifth Circuit's interpretation of face value in Onyiego.  Id.  Because it found that the postage statements were not financial instruments, the Ninth Circuit held that they could not have the required face value and reversed the district court.  Id. at 770–71.

As to our own precedent, the former Fifth Circuit's holding in United States v. Robinson implicitly supports Onyiego's and Sargent's interpretations of face value.  See 553 F.2d 429, 431 (5th Cir. 1977).[7]  In Robinson, the defendant was convicted under § 2314 for conduct related to a scheme to promote worthless mining land.  Id.  During the course of the scheme, the defendant assigned a promissory note for $17,250 to a Mr. Scamardo, who was subsequently unable to collect on the note.  Id.  Scamardo sued and received a $3,500 settlement.  Id.  The

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

24

defendant challenged his conviction under § 2314 in part on the ground that the government failed to prove "the [promissory note] had a value in excess of $5,000." Id.

The Robinson court, after noting § 2311's definition of value, stated: "Face value was clearly more than $5,000. . . . Subsequent settlement of litigation on the note for less than $5,000 does not deprive this evidence of the sufficiency needed to sustain a criminal conviction . . . ." Id. Thus, our predecessor court affirmed the defendant's conviction.

In sum, we agree that the plain meaning of face value—"the value indicated on the face of an instrument"—is conclusive as to the statutory interpretation issue. See MERRIAM-WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (3d ed. 2002); BLACK'S LAW DICTIONARY (9th ed. 2009); see also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S. Ct. 1026, 1031 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (internal quotation marks and alterations omitted)). Brown would have face value be the value indicated on the face of an instrument only if it is its "actual worth." That is simply not face value. We hold that "face value" in the context of § 2314 is the value indicated, or

25

written, on the face of the instrument.[8]

Turning to this case, each of the two Weinstein U.S. Treasury checks indicated on their face that they had a value exceeding $5,000. Accordingly, the government produced sufficient evidence on the value element for the jury to convict Brown on this ground.

## C.     Restitution

Defendant Brown also challenges the district court's restitution order of $120,421.59. Brown argues that the unindicted Winnick and Cassidy transactions should not have been included in the restitution order.

This Court reviews <u>de novo</u> the legality of a restitution order but reviews for clear error the factual findings underpinning a restitution order. <u>United States v. Valladares</u>, 544 F.3d 1257, 1269 (11th Cir. 2008). A district court lacks inherent

---

[8]Brown argues that our decision in <u>United States v. Sarro</u> requires that the checks must have had an actual worth of at least $5,000. <u>See</u> 742 F.2d 1286, 1295–96 (11th Cir. 1984). <u>Sarro</u>, however, involved paintings, not financial instruments, and in any event, we <u>affirmed</u> the defendants' convictions for conspiracy to violate § 2314. In <u>Sarro</u>, the district court "instructed the jury that the government did not have the burden of proving that the paintings were actually worth $5,000." <u>Id.</u> at 1295.

In rejecting the defendants' claim of instructed error, we noted their failure to distinguish between being charged with a substantive violation of § 2314 and a conspiracy to violate § 2314. <u>Id.</u> at 1295–96. All that mattered was the "conspirator's <u>belief</u>" that the paintings' value was at least $5,000. <u>Id.</u> at 1296. In mere dicta, we stated that "proof that the paintings had a minimum value of $5,000 would have been necessary had appellants been charged with a substantive violation of section 2314." <u>Id.</u> at 1295. Given that paintings, unlike financial instruments, have no face value, we did not rule on the meaning of value (face, par, or market). <u>Sarro</u> does not approach dictating the outcome here.

authority to order restitution and derives it only as explicitly authorized by statute.

Id. In this case, that authority is found in the Mandatory Victim Restitution Act ("MVRA"), which requires the district court to order restitution if the defendant is convicted of an offense "in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(B).

As the meaning of "victim" is crucial to this restitution issue, it is instructive to review the statutory language and history. Section 3663A(a)(2) of the MVRA defines "victim" as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

This expansive definition of "victim" is identical to that of 18 U.S.C. § 3663, part of the Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, 96 Stat. 1248 (codified as amended at 18 U.S.C. §§ 1512–1515, 3579–3580).

However, § 3663's current definition of victim is a result of Congress's reaction to the Supreme Court's narrow interpretation of the statute's original language in Hughey v. United States, 495 U.S. 411, 110 S. Ct. 1979 (1990). The Supreme Court in Hughey held that restitution could be authorized under § 3663

27

"only for the loss caused by the specific conduct that [was] the basis of the offense of conviction." Id. at 413, 110 S. Ct. at 1981. Subsequently, Congress amended § 3663 through the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789. In its present form, § 3663 reads in pertinent part:

> [T]he term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern . . . .

18 U.S.C. § 3663(a)(2) (emphasis added).

Following the amendment, courts viewed Congress's action as intended to overturn in part the Supreme Court's narrow interpretation of victim in Hughey. See United States v. Dickerson, 370 F.3d 1330, 1338, 1341 (11th Cir. 2004) (collecting cases). Courts have agreed that, in light of the expanded statutory language, restitution orders for conduct closely related to the offense of conviction are appropriate under either § 3663 or § 3663A(a)(2), in addition to the specific conduct for which the defendant was convicted. See, e.g., Dickerson, 307 F.3d at 1343; United States v. Henoud, 81 F.3d 484, 489 (4th Cir. 1996); United States v. Kones, 77 F.3d 66, 70 (3d Cir. 1996).

This Court repeatedly has rejected attempts to narrow the scope of "victim"

under the statute. In <u>United States v. Dickerson</u>, we construed the meaning of § 3663A(a)(2) in a wire fraud case. 370 F.3d at 1330. <u>Dickerson</u> involved a scheme to defraud the Social Security Administration ("SSA"). <u>Id.</u> at 1332. The disputed conduct included in the restitution order also related to the same SSA scheme, but the conduct had not been charged because it lay outside the statute of limitations. <u>Id.</u> at 1334. We held that restitution may properly be awarded for a victim's losses caused by "the defendant's conduct <u>in the course of the scheme</u> . . . where such losses were caused by conduct <u>outside the statute of limitations</u>." <u>Id.</u> at 1342 (emphasis added). Nevertheless, we emphasized that "a criminal defendant cannot be compelled to pay restitution for conduct committed outside of the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction." <u>Id.</u> at 1341.

We also addressed § 3663A(a)(2)'s meaning in <u>United States v. Valladares</u>, 544 F.3d 1257 (11th Cir. 2008). In <u>Valladares</u>, the defendant challenged the restitution order that followed her conviction for, <u>inter alia</u>, conspiracy to defraud the Medicare program. <u>Id.</u> at 1261. The defendant was indicted on a scheme to defraud by which the defendant gave illegally obtained prescriptions to pharmacies, which used them to submit fraudulent reimbursement claims to Medicare. <u>Id.</u> At trial, the government presented evidence of another related

29

scheme, albeit not one charged in the indictment. Id. This scheme involved the defendant's own company, PRN Home Health Care, through which the defendant submitted similar fraudulent Medicare claims (the "PRN" scheme). Id.

The defendant in Valladares argued that she should not have to pay for the PRN scheme because it was not charged in the indictment. Id. at 1269. This Court noted that "the victim and the purpose of each scheme were the same." Id. at 1268. Concluding that the PRN scheme was therefore "relevant conduct," it followed that the restitution award could include the losses from both indicted and unindicted schemes. Id. at 1270.

With that background, we note that the district court here expressly found: "the evidence shows that the scheme included the Cassidy and Win[n]ick checks" because "the way of accomplishing th[em] was the same." This fact finding is supported by the record and is not clearly erroneous. Indeed, the Cassidy and Winnick transactions fit well within the overarching scheme alleged in the indictment: in both, Brown sought to obtain money by means of false and fraudulent representations. As recounted at length above, the Cassidy and Winnick transactions were closely related and identical in every material respect to the Weinstein transaction.

Simply put, given its fact finding that the scheme included all the closely

30

related and identical transactions, the district court properly included the Cassidy

and Winnick transactions in the restitution order as they were "victims" within the

meaning of the MVRA.  That the indictment did not name Cassidy and Winnick is

immaterial.  See Dickerson, 370 F.3d at 1339 ("[C]ourts have held that restitution

may be ordered to a victim not named in the indictment . . . .").  The Cassidy and

Winnick transactions could be considered relevant conduct.  Thus, the district

court did not err in including them in the restitution order.  See Valladares, 544

F.3d at 1270.

**AFFIRMED.**