[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11740

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOHN IFEOLUWA ONIMOLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cr-00492-WMR-CCB-8

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

John Onimole appeals his 36-month sentence for money laundering in violation of 18 U.S.C. §§ 1957 and 2. He argues that the district court erred in (1) calculating his guideline range by considering other relevant conduct for which he was not convicted and which was not proven beyond a reasonable doubt; (2) ordering restitution for losses caused by the overall conspiracy instead of those caused solely by his conduct; and (3) denying a reduction for acceptance of responsibility. After review, we affirm.

## I.    Background

In 2020, a federal grand jury issued a 21-count superseding indictment charging Onimole, among other codefendants, with one count of conspiracy and one count of money laundering (Counts 1 and 19). According to the indictment, Onimole, Ahamefule Aso Odus ("Aso"), Chukwukadibia Ikechukwu Nnadozie ("Chuka"), and Uchechi Chidimma Odus ("Uche"), conspired to knowingly engage in a business e-mail compromise

("BEC") scheme[1] and a "romance scam" scheme[2] between approximately February 2017 and September 2018. According to the indictment, the co-conspirators set up numerous personal and business bank accounts for sham companies for the purposes of receiving the ill-gotten gains from the schemes. Once the stolen funds were received, the conspirators then quickly dispersed the money through wire transfers to other accounts or by making check or cash withdrawals in an attempt to conceal the source of the funds. Count 19 charged Onimole, Aso, and Uche with money laundering based on one of the BEC schemes.

Onimole entered an open plea of guilty to the money laundering charge (Count 19). At the change-of-plea hearing, the government set forth the factual basis for the charge. The government explained that Count 19 incorporated by reference the factual allegations of Count 1 (the conspiracy count). Specifically,

---

[1] In a BEC, an e-mail message which appears legitimate—but in fact is not—is sent to a business and fools an unwitting employee to interact with the message, which then deploys malware into the employee's computer system. From there, the malware collects secured information and monitors correspondence to determine when a financial transaction is scheduled to take place. When one is scheduled between legitimate parties, the illegitimate third party that has been monitoring the company through the malware then sends a "spoofed" e-mail that again appears legitimate and changes the wiring instructions thereby sending the money into a bank account controlled by the conspirators.

[2] In a romance scam, the conspirators have fake profiles on dating websites and engage with users of the site and cultivate a romantic relationship only to then trick the victim into sending the conspirator money under false pretenses.

"[t]he defendants named in the first superseding indictment," including Onimole, "were all residents of the metro Atlanta area and they served as money launderers for other conspirators throughout the country and throughout the world who conducted [BEC] schemes, romance fraud schemes, and targeted companies and individuals across the United States." The defendants set up numerous bank accounts, including ones for sham companies that they registered with the State of Georgia for the purpose of receiving the stolen funds. Once the funds were received, they quickly disbursed the funds into other accounts through wire transfers or by making check or cash withdrawals.

On July 26, 2018, as a result of a BEC, company BCL wired $46,450.85 to a bank account controlled by defendants. At the direction of defendant Aso, another co-conspirator used the stolen funds to purchase cashier's checks payable to others, including Onimole. Onimole then cashed the $22,230 check.

Onimole agreed with the government's summary of the facts. However, he clarified, upon further questioning, that he did not know that the source of the money was fraudulent, and he only learned about that after the fact. His counsel then explained that Onimole's plea was not based on actual knowledge but on deliberate ignorance—meaning that he understood the circumstances were highly suspicious and logically indicated the funds were "from an inappropriate source," but he actively disregarded the circumstances because his co-conspirators gave

him money for cashing the check.[3]  The government asserted that it believed it could prove actual knowledge at trial, but agreed that Onimole could alternatively be convicted on a deliberate ignorance theory.  The court then asked Onimole whether he "suspect[ed] that the money was not legitimate, that it was from some illegal or criminal purpose," and he stated "Yes, your honor.  I had a feeling. I did have a feeling.  I mean, I was told it wasn't.  But I just had a strong feeling and I still do."  The court further clarified, asking whether Onimole knew "when [he] got involved in it and started preparations to receive the money and to withdraw the money and convert it to cashier's checks and to otherwise disburse it, did [he] know then that that money came from criminal activity?" Onimole stated "[a]t that point, yes, sir."

The district court then found that there was a factual basis for the plea, noting that based on the government's proffer it believed the government could prove actual knowledge, but alternatively, the evidence was sufficient for a jury to find Onimole deliberately ignorant.  Accordingly, it accepted his plea.

Following Onimole's plea, the United States Probation Office prepared a presentence investigation report ("PSI").  The PSI indicated that Onimole's involvement in the underlying conspiracy consisted of opening bank accounts used to receive funds obtained from BEC schemes and withdrawing those funds.  Onimole was linked to a SunTrust bank account, two Bank of America accounts, and a sham company called "Branagh, Inc."  The PSI also indicated

---

[3] Onimole received $1,000 for his services.

that Onimole was held accountable for an intended loss of approximately $1,267,996.06 based on his participation in several BEC schemes in addition to the one involving BCL that served as the basis for Count 19, and it detailed his connection with those schemes.  Onimole objected to this information, arguing that he did not plead guilty to Count 1 and he was not liable for any losses stemming from Count 1.  The probation officer maintained that even though Onimole did not plead guilty to Count 1, the other schemes were properly included and considered as relevant conduct under U.S.S.G. § 1B1.3.

The probation officer determined that Onimole's base offense level was 22 pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1 because Onimole was responsible for an intended loss amount that was more than $550,000 but less than $1,500,000.  After accounting for specific offense enhancements and a three-point reduction for acceptance of responsibility, Onimole's resulting total offense level was 20.  An offense level of 20 and a criminal history score of I resulted in a guidelines range of 33 to 41 months' imprisonment.

Onimole objected, arguing that he should be responsible for only the value of the laundered funds he pleaded guilty to in Count 19, which would result in a total offense level of 11 and a lower guidelines range.  In light of Onimole's objections to the inclusion of relevant conduct, the government objected to the three-point reduction for acceptance of responsibility.

Prior to sentencing, Onimole filed a sentencing memorandum, asserting that he should receive a three-point

reduction for his acceptance of responsibility because he pleaded guilty to Count 19. He then reiterated his argument that he should only be held responsible for the specific conduct underlying Count 19, which would result in a significantly lower offense level and guidelines range of zero to six months' imprisonment. He also filed a motion *in limine* to exclude "irrelevant, inadmissible evidence and issues at his sentencing," seeking exclusion of any evidence at sentencing that did not specifically relate to Count 19.

At sentencing, the district court stated that it was not going to "grant . . . or consider" the motion *in limine* because such a motion is designed to prevent evidence from being introduced—typically when juries are involved. But, in this instance, the court needed to know about what Onimole did not want the court to consider in order to resolve the objections to the PSI and determine whether the objected-to conduct was relevant or not. Onimole argued that there was "an enormous difference between a conspiracy and a substantive count." He argued that he would have denied the conspiracy allegations at trial because he was not involved in managing or controlling the bank accounts, his codefendants had access to his personal information, and his codefendants exploited him to engage in activities without his knowledge. Thus, he maintained that the conduct underlying the money laundering count to which he pleaded guilty was "totally disassociated from all the other allegations . . . about him being involved in other [BEC schemes," and that only the conduct related to the substantive money laundering count should be considered. The court noted that the sentencing guidelines direct the district

court to consider all relevant conduct, and asked Onimole whether he had any authority to support his position.  Onimole admitted that he did not have any additional authority other than what he presented in his motion *in limine*.

The government argued that, under the guidelines and this Court's precedent, the district court should consider all relevant conduct, which includes uncharged conduct.  The court overruled Onimole's objection and allowed the government to present evidence on relevant conduct related to other BEC schemes and money laundering activities that involved Onimole.

The government then called Special Agent Joshua Barnes who testified at length to Onimole's involvement in the BEC schemes.  Generally, his testimony established that Onimole registered the fictious company Branagh, Inc. in his name, with the State of Georgia in June 2018.[4]  Onimole also opened several business bank accounts for the company, but none of the accounts had any transactions consistent with business activities.  In addition to the conduct to which Onimole pleaded guilty in Count 19 involving company BCL, the investigation connected him with other BEC schemes involving companies AMM, HZOH, STC, GWL, Orahealth, and ZTB.

For instance, the agent testified that, as a result of a BEC scheme, company A.M.M. wired $54,918.67 to a SunTrust Bank

---

[4] Branagh was administratively dissolved by the Secretary of State in August 2019.

account controlled by a co-conspirator. After the money was received, two cashier's checks totaling $52,000 were issued—one of which was for $30,000 payable to Onimole. The same day the check issued, Onimole's driver's license was used to cash the check, and his personal identifying information was listed on the bank's currency transaction report ("CTR").[5]   Onimole listed his occupation on the report as "retail sales."

This pattern continued with the other BEC schemes. For example, the agent testified that, after the funds from HZOH, STC, and ZTB were wired from the respective companies into a co-conspirator's account, a portion of those funds would then be directly issued to Onimole via a cashier's check or directly transferred into his personal bank account.[6] As for the Orahealth and GWL scheme, the funds were transferred to a bank account in the name of Onimole's sham company Branagh, Inc., and Onimole was a signer on the account.[7]

---

[5] Banks are required to complete a CTR for any transaction involving cash over $10,000.

[6] A wire transfer of close to $72,000 of the stolen ZTB funds was attempted from one co-conspirator's account to Onimole's personal Wells Fargo account, but the wire was returned as a "beneficiary name mismatch" because the recipient of the money was listed as "Branagh, Inc.," and that name did not match the name on the designated account. Once the funds were returned to the original co-conspirator's account, they were ultimately withdrawn by other co-conspirators.

[7] On the same day as GWL's wire, some of the stolen GWL funds were then used to purchase three airline tickets to California, one of which was in

Following the agent's testimony and additional argument from the parties, the district court concluded that the government had met its burden to establish the existence of the conspiracy by a preponderance of the evidence and that the other schemes were relevant conduct. Accordingly, the district court determined that the intended loss amount of $1,267.966.06[8] was the correct amount even though all of that money did not necessarily "flow[]" to Onimole.

The district court then sustained the government's objection to the reduction for acceptance of responsibility, noting that the court "spent most of the day talking about whether the defendant did the things the Government says he did and which he says he did not," which was not consistent with an acceptance of responsibility reduction. Nevertheless, the court noted that it would keep Onimole's position in mind when considering whether to depart or vary downward. Thus, the revised total offense level of 23 and a criminal history category of one resulted in an advisory guidelines range of 46 to 57 months' imprisonment.

Following arguments from the parties as to the appropriate sentence and consideration of the 18 U.S.C. § 3553(a) factors, the district court varied downward and sentenced Onimole to a below-guidelines sentence of 36 months' imprisonment to be followed by

---

Onimole's name. Onimole was then listed on a CTR from a bank branch in California withdrawing $15,000 of the stolen funds.

[8] The actual loss amount was $1,117,966.06.

3 years' supervised release.  The district court also imposed restitution in the amount of $1,117,966.06, jointly and severally, with Onimole's co-conspirators.  Finally, the district court ordered forfeiture of $550,000—the minimum amount of funds laundered.  This appeal followed.

## II.    Discussion

Onimole argues that the district court erred in (1) calculating his base offense level by considering other relevant conduct for which he was not convicted and which was not proven beyond a reasonable doubt; (2) ordering restitution for losses caused by the overall conspiracy instead of those caused solely by his conduct; and (3) denying a reduction for acceptance of responsibility.  We address each argument in turn.

### A.  Calculation of the base offense level

Onimole argues that the district court erred in increasing his base offense level based on the total intended loss value of the laundered funds from the BEC schemes ($1,267,966.06), and that the court should have limited the value to the actual loss involved in the substantive money laundering offense to which he pleaded guilty ($22,230).

"We review a district court's interpretation of the Sentencing Guidelines *de novo,* and the determination of the amount of loss involved in the offense for clear error." *United States v. Stein,* 846 F.3d 1135, 1151 (11th Cir. 2017) (quotations omitted). "We review only for clear error the application of the relevant

conduct guideline in § 1B1.3 to the facts of the case." *United States v. Valladares*, 544 F.3d 1257, 1267 (11th Cir. 2008).

Section 2S1.1 of the Guidelines establishes the base offense level for money laundering offenses. *See* U.S.S.G. § 2S1.1. It provides, as relevant here, that the base offense level is "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise." *Id.* § 2S1.1(a)(2). Under the relevant table, if the value of the loss attributable to the defendant is more than $550,000 but less than $1,500,000, the base offense level is increased by 14 points. *Id.* § 2B1.1(b)(1)(H).

We have held that "[w]hen calculating a defendant's sentencing range under the Guidelines, the sentencing court must consider all 'relevant conduct' as defined in [U.S.S.G.] § 1B1.3." *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015); *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) ("In addition, proper calculation of the guidelines requires consideration of all relevant conduct, not merely charged conduct." (quotations omitted)). Section 1B1.3 of the guidelines, defines relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). "When an offense involves 'jointly undertaken criminal activity,' [whether or not charged as a conspiracy,] relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *United*

*States v. Bradley*, 644 F.3d 1213, 1296 (11th Cir. 2011) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). "[R]elevant conduct is broadly defined to include both uncharged and acquitted conduct that is proven at sentencing by a preponderance of the evidence." *Siegelman*, 786 F.3d at 1332. "Accordingly, under § 1B1.3(a), when a defendant is acting in concert with others, the appropriate conduct to consider for sentencing purposes is far broader than the conduct that drove the original conviction." *Bradley*, 644 F.3d at 1297.

We have held that, even absent a conspiracy charge, the district court may hold all participants responsible for the losses caused by the jointly undertaken scheme when the defendant's actions suggested that he was actively involved in the criminal scheme and that he agreed to jointly undertake in the scheme. *See United States v. Whitman*, 887 F.3d 1240, 1248 (11th Cir. 2018). When the defendant challenges the loss amount calculation, "the government bears the burden of supporting it with reliable and specific evidence." *See United States v. Wilson*, 788 F.3d 1298, 1318 (11th Cir. 2015).

Here, as discussed above, the government presented extensive evidence at the sentencing hearing that directly linked Onimole to several other BEC money laundering schemes in addition to the one that served as the basis for Count 19. This evidence included that after the stolen funds were wired from the respective companies into a co-conspirator's account, a portion of those funds would then be directly issued to Onimole via a cashier's check, directly transferred into his personal bank account,

or were otherwise connected with his company Branagh, Inc. Thus, there was sufficient evidence for the district court to conclude that Onimole agreed to participate in a jointly undertaken criminal scheme.[9] *See Whitman*, 887 F.3d at 1248–49. Based on this evidence, the district court did not clearly err in considering the other BEC schemes as relevant conduct and in concluding that Onimole was responsible for the losses caused by the jointly undertaken schemes. *Id.*; *see also* U.S.S.G. § 1B1.3. As a result, the district court properly determined Onimole's base offense level. U.S.S.G. §§ 2S1.1(a)(2), 2B1.1(b)(1)(H).

---

[9] Onimole argues that relevant conduct must be proven beyond a reasonable doubt and cannot be based on judicial factfinding, citing *Alleyne v. United States*, 570 U.S. 99 (2013). This argument is foreclosed by our binding precedent. *See United States v. Charles*, 757 F.3d 1222, 1225 (11th Cir. 2014) (rejecting an identical *Alleyne*-based challenge and holding that "a district court may continue to make guidelines calculations based upon judicial fact findings and may enhance a sentence—so long as its findings do not increase the statutory maximum or minimum authorized by facts determined in a guilty plea or jury verdict"); *United States v. Campbell*, 765 F.3d 1291, 1301 n.10 (11th Cir. 2014) (rejecting argument "that all sentencing enhancements are elements . . . that a jury must decide" and reaffirming holding in *Charles*). Although Onimole contends that our precedent is inconsistent with *Alleyne* and other related Supreme Court decisions, under the prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

### B. Calculation of the restitution amount

Onimole argues that, even if he is accountable for the total intended loss for purposes of his base offense level, the district court erred in imposing the total actual loss—$1,117,966.06, jointly and severally—as the restitution amount because a defendant is responsible "only for the loss caused by the specific conduct" that is the basis of his conviction, citing *Hughey v. United States*, 495 U.S. 411, 413 (1990).[10]

"We review *de novo* the legality of an order of restitution, but review for abuse of discretion the determination of the restitution value of lost or destroyed property. We review for clear error factual findings underlying a restitution order." *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007) (quotations omitted) (internal citations omitted).

The district court, in imposing a sentence, must order restitution in accordance with the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. "The method for calculating actual loss, as opposed to intended loss, under the Sentencing Guidelines is largely the same as the method for establishing actual loss to identifiable victims under the MVRA. *Stein*, 846 F.3d at 1153

---

[10] To the extent that Onimole asserts that his financial situation should have been accounted for when the court ordered restitution or forfeiture, that argument is without merit. *See United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000) ("The district court is not required, nor does it have the discretion, to consider the offender's ability to pay when ordering restitution under the [Mandatory Victim Restitution Act].").

(quotation marks omitted).  Indeed, "[i]n most cases, the amount of actual loss under the guidelines will be the same as the restitution figure." *Id.*

The Supreme Court in *Hughey v. United States* held that restitution could be authorized under the Victim and Witness Protection Act of 1982 (VWPA) "only for the loss caused by the specific conduct that [was] the basis of the offense of conviction." 495 U.S. 411, 413 (1990).  However, Onimole's reliance on *Hughey* is misplaced.  As we have previously explained, post-*Hughey*, Congress's enactment of "the MVRA all but eviscerated *Hughey* with respect to crimes involving schemes."  *United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013) (quoting *United States v. Dickerson*, 370 F.3d 1330, 1341 (11th Cir. 2004)).  Congress greatly expanded the definition of "victim" under the MVRA, and we have held "that by defining 'victim' expansively in scheme-based crimes, Congress partially overrul[ed] *Hughey*'s restrictive interpretation of the VWPA and expand[ed] district courts' authority to grant restitution." *Id.* at 1293 (quoting *Dickerson*, 370 F.3d at 1338).  Thus, while "[a]n award of restitution must be based on the amount of loss actually caused by the defendant's conduct," *United States v. Foster*, 878 F.3d 1297, 1307 (11th Cir. 2018), "[c]ourts have agreed that, in light of the expanded statutory language, restitution orders for conduct closely related to the offense of conviction are appropriate under [the MVRA], in addition to the specific conduct for which the defendant was convicted." *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011); *see also United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008) (upholding a restitution award

that included losses from uncharged conduct and holding that "the district court was permitted to consider the losses [to the victim] incurred from [the uncharged] scheme" because the uncharged scheme "could be considered relevant conduct").

Accordingly, as discussed above, because the other BEC schemes were properly considered relevant conduct, the district court did not err in including the actual losses from those related BEC schemes in the restitution award.[11] *Brown*, 665 F.3d at 1252; *Valladares*, 544 F.3d at 1269.

### C. *Reduction for Acceptance of Responsibility*

Onimole argues that the district court erred in denying him a two-point reduction under the guidelines for acceptance of responsibility, which he maintains he should have received because he pleaded guilty to Count 19.

A defendant is entitled to a two-point reduction of his offense level if he clearly demonstrates acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(a). Importantly, "[a] defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right." *Id*. § 3E1.1 cmt. (n.3). Rather, to determine whether the reduction applies, the district court must consider, among other factors, the timeliness of

---

[11] Onimole argues that the district court failed to connect him to the total actual loss of $1,117,966.06. We disagree. As discussed previously, there was a preponderance of the evidence linking Onimole to the BEC schemes that made up the actual loss amount involving victims BCL, STC, HZOH, GWL, Orahealth, ZTB, and AMM.

the defendant's acceptance of responsibility and whether he truthfully admitted that he engaged in the conduct comprising the offenses of conviction and "any additional relevant conduct for which he is accountable under § 1B1.3." *Id.* § 3E1.1 cmt. (n.1(A), (H)). "[A] defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction" in order to receive a reduction—in other words, the defendant can remain silent. *Id.* § 3E1.1 cmt. (n.1(A)). However, "[a] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility . . . ." *Id.*; *see also United States v. Moriarty*, 429 F.3d 1012, 1022–23 (11th Cir. 2005) ("Although a guilty plea can constitute significant evidence of acceptance of responsibility, it may be outweighed by conduct of the defendant inconsistent with an acceptance of responsibility.").

"In reviewing a district court's refusal to grant a reduction under § 3E1.1, [we] review[] its interpretation of the Guidelines de novo. We review the factual findings upon which the denial of the acceptance reduction is based for clear error." *United States v. Roosevelt Coats*, 8 F.4th 1228, 1262 (11th Cir. 2021) (quotations omitted) (internal citation omitted). "[T]he determination of whether a defendant has adequately manifested acceptance of responsibility is a flexible, fact sensitive inquiry" to which we give "great deference." *Id.* (quotations omitted). "Thus, we will not set aside a district court's determination that a defendant is not entitled to a § 3E1.1 adjustment unless the facts in the record clearly

establish that the defendant has accepted responsibility." *Moriarty*, 429 F.3d at 1022–23.

Here, the district court did not clearly err in determining that Onimole had not clearly demonstrated acceptance of responsibility. Although he pleaded guilty to Count 19, he, at the very least, frivolously contested relevant conduct, which is inconsistent with acceptance of responsibility. *See* U.S.S.G. § 3E1.1 cmt. (n.1(A)). And we have upheld the denial of acceptance of responsibility under similar circumstances. *See United States v. Tejas*, 868 F.3d 1242, 1248 (11th Cir. 2017) (upholding denial of reduction for acceptance of responsibility where defendant "went beyond mere silence" and affirmatively denied relevant conduct); *United States v. Sammour*, 816 F.3d 1328, 1341 (11th Cir. 2016) (upholding denial of reduction for acceptance of responsibility where defendant "downplay[ed] his culpability at the sentencing" and "frivolously contested relevant conduct" (alterations adopted)). In light of the record before us, we cannot say that "the record clearly establish[es] that [Onimole] has accepted responsibility." *Moriarty*, 429 F.3d at 1022–23. Accordingly, he is not entitled to relief. *Id.*; *Tejas*, 868 F.3d at 1248.

## III. Conclusion

For the above reasons, we affirm Onimole's conviction and sentence.

**AFFIRMED.**